## COWART *et al. v.* SINGLETARY.

1. While the report of the auditor was not as full or explicit as it might have been, under the facts of the case there was no reversible error in overruling a motion for a rereference.

(*a*) The recovery of the amount of an open account was waived; and if there was a lack of specification as to its items, this will not require a reversal.

2. The action was equitable in character, the evidence was sufficient to authorize the finding of the auditor in favor of the plaintiff, and the ruling of the presiding judge in overruling the exceptions thereto was not error.

3. It is legally possible for one person to sell land to another at an agreed price and at the same time to secure the right to repurchase it; and if actually made in good faith, such a transaction is enforceable.

4. The obligee in a bond for title made a warranty deed to another. In the deed it was provided that the grantee bound himself to see that the obligations of his grantor under the bond should be complied with, and the grantee took possession and rented to the grantor. *Held*, that this provision bound the grantee to pay the purchase-money; and it was not obnoxious to the statute of frauds.

(*a*) Whether the transaction in the present case was in fact a sale with an option to repurchase, or a method of securing an indebtedness, and whether there was fraud, or usury, or what was the actual consideration, were questions dependent upon the evidence; and the auditor having reported in favor of the taker of the deed attacked on such grounds, and the presiding judge having overruled exceptions to his report, and such finding and ruling being authorized by the law and evidence, this court will not interfere.

5. Where a bond for title stipulated that it was not transferable, and the obligee, before paying any of the notes given for the purchase-money, executed a warranty deed to a third person, in which there was a provision binding the grantee to pay the purchase-money debt of the grantor, and the grantor became the tenant of the grantee; and where

the grantee paid to the obligor in the bond more than half of the purchase-money notes as they became due, if thereafter the maker of the bond, with the consent of the obligee therein, accepted from another the unpaid balance of the purchase-money before it fell due, and executed to such person a fee-simple conveyance, he taking with notice of the rights of the grantee from the obligee in the bond, and thereafter conveying to such obligee a life-estate in one half of the land,—under such circumstances the grantee from the obligee in the bond could, in a proper equitable action, obtain a decree against the person so taking a deed from the obligor in the bond, requiring such person to make a deed to the plaintiff upon payment of the amount paid out by such defendant, less proper credits for mesne profits, and a decree against such person and the obligee in the bond, cancelling the deed to the latter and recovering the property.

(a) No question of whether tender was necessary arises under the pleadings and evidence.

(b) The obligor in the bond having died, no representative of the estate was made a party, and the action proceeded against the grantee from such obligor and the obligee in the bond. The defense was not by an administrator of such obligor, but by the obligee and the person taking a conveyance from the obligor, with notice.

JULY 21, 1913. REHEARING DENIED AUGUST 14, 1913.

Exceptions to auditor's report.     Before Judge Worrill.     Early superior court.     May 21, 1912.

On January 27, 1907, A. J. Singletary filed his equitable petition against R. S. Grimsley, H. H. Grimsley, Caroline Cowart, and Mrs. E. E. Holmes. It does not appear that Mrs. Holmes was served, or that her administrator was made a party after her death. The petition alleged, in substance, as follows: On December 24, 1902, Mrs. Holmes bargained to Caroline Cowart a certain described lot of land. The purchase-price was fixed at $1,250, represented by twenty-three notes of fifty dollars each, and one note for a hundred dollars, falling due respectively on the first days of September, October, November, and December in each successive year thereafter, the last note being due on December 1, 1908. Mrs. Holmes gave to Caroline a bond for title in accordance with these terms. On January 12, 1903, Caroline Cowart represented to the plaintiff that she was unable to comply with her agreement to pay the notes as they became due, and offered to convey to him the land if he would pay the notes as they matured. She accordingly executed to him a warranty deed for the land, in which was contained a recital that he bound himself to see that her obligations to Mrs. Holmes should be complied with. He accordingly paid to Mrs. Holmes the notes as they matured, and at the date of the

filing of the petition he had paid to her fifteen of the notes, amounting to $750, besides interest. Caroline Cowart, after the execution of her deed to the plaintiff, leased the land from him, and remained in possession thereof as his tenant; but the term of her tenancy has expired. On November 6, 1906, she and R. S. Grimsley, for the purpose of defrauding him and defeating his rights and with full knowledge of them, had Mrs. Holmes to execute to Grimsley a warranty deed to the land. (H. H. Grimsley, though made a party, appeared in the progress of the case to have no interest in the matter.) R. S. Grimsley paid to Mrs. Holmes the balance due on the land, and all the purchase-money notes were surrendered to him except those which the plaintiff had previously taken up. Grimsley made a deed conveying a life-estate in one half of the land to Caroline Cowart. It is the purpose and intention of Grimsley to take possession of the land and of Caroline Cowart to surrender it to him. The plaintiff has always been ready, willing, and able to comply with his contract and pay the balance of the purchase-money due as it matured; and he offers to do so. He prays that Grimsley be enjoined from taking possession of the land; that Caroline Cowart be enjoined from surrendering it to him; that she be ousted from possession; that his lien for rent be established; that Grimsley be required to accept so much of the purchase-price of the land as has fallen due by the terms of the notes, and be required to deliver to the plaintiff the notes for such amount held by Grimsley, and to accept the payment of the remaining notes as they mature; that, upon the payment by the plaintiff of the balance of the purchase-money, Grimsley be required to execute to the plaintiff a deed to the land; that the deed from Grimsley to Caroline Cowart be surrendered and canceled; and for process and general relief. The plaintiff amended by alleging that Caroline Cowart was insolvent, and that the defendants had remained in possession, and had enjoyed the rents, issues, and profits of the yearly value of $200, for which the plaintiff prayed judgment as mesne profits.

Answers were filed by R. S. Grimsley and Caroline Cowart, in which they denied the alleged grounds for recovery, and averred that Grimsley was a purchaser for value from Mrs. Holmes. They attacked the deed from Caroline Cowart to Singletary on substantially the following grounds: (1) It was procured by fraud.

(2) It was procured by duress. (3) It was upon an inadequate consideration, coupled with great disparity in mental capacity on the part of the contracting parties. (4) It was given to secure a usurious debt. (5) It was given as a security for or in payment of the debts of her husband. It was also contended that Singletary made no valid and binding promise in writing to pay the notes given by Caroline Cowart to Mrs. Holmes. Caroline Cowart offered, in her answer, to pay to the plaintiff any sum that might be found justly due to him.

A demurrer to the petition was overruled, but no exception was taken to that ruling. A verdict was rendered in favor of the plaintiff. The case was brought to this court, and the judgment was reversed on account of errors in the charge. *Grimsley* v. *Singletary,* 133 *Ga.* 56 (65 S. E. 92, 134 Am. St. R. 196). Later the case was referred to an auditor, whose report found in favor of Singletary. A motion for a rereference was made and denied; and to this ruling exceptions pendente lite were filed, and error was subsequently assigned thereon. Exceptions of law and fact to the report of the auditor were filed. The presiding judge overruled the exceptions of law, declined to approve the exceptions of fact, and rendered a decree, in substance, that Grimsley should recover of Singletary $435.70 with interest from the date of the auditor's report (that being the difference between the amount paid by Grimsley to Mrs. Holmes and the amount found against him on account of mesne profits for the half of the land of which he had held possession), less $100 for the rent of the land for the then current year; that, upon tender of payment of this net amount, Grimsley should execute to Singletary a conveyance of the premises in dispute; that the plaintiff recover of Caroline Cowart and Grimsley the premises in dispute, subject to a lien in favor of Grimsley for the amount decreed in his favor with interest; that Singletary recover of Caroline Cowart $570 rent; and that the deed from Grimsley to her be canceled. Caroline Cowart and Grimsley excepted. The record does not show whether Mrs. Holmes was ever served. No answer by her is in the record. But it appears in the evidence that she was dead at the time of the trial, and no representative on her estate is shown to have been made a party. Other material facts appear in the opinion, infra.

*Walter Park* and *Pope & Bennet,* for plaintiffs in error.

*C. L. Glessner* and *A. G. Powell,* contra.

LUMPKIN, J. (After stating the foregoing facts.)

1-3. The members of this court are agreed as to all matters involved in this case, except one. The issues of fact were found in favor of Singletary by a jury on a former trial, and by the auditor when the case was referred to him. The presiding judge has approved that finding, and the evidence was sufficient to authorize him to do so. There was no error in overruling the motion for a rereference. The report of the auditor, while somewhat meagre, was sufficiently full to withstand the attack made upon it in the motion for a rereference, and a reversal is not required. This disposes of the contentions that the deed made by Caroline Cowart to Singletary was procured by fraud; that the transaction was not in fact a sale with an option to repurchase, but was the securing of an indebtedness; that this debt was infected with usury and included a debt of her husband; that there was such mental disparity between the parties and such inadequacy of consideration as to amount to fraud; and all others depending on questions of fact. Under the evidence the decision in *Baggett* v. *Trulock,* 77 *Ga.* 369 (3 S. E. 162), is not controlling. See, in this connection, *Felton* v. *Grier,* 109 *Ga.* 320 (35 S. E. 175); *McElmurray* v. *Blodgett,* 120 *Ga.* 9 (47 S. E. 531); *Brown* v. *Bonds,* 125 *Ga.* 833, 838 (54 S. E. 933). We were requested to review and overrule the decision in *Felton* v. *Grier,* supra. Its special application to this case is the ruling, that, it being legally possible for the owner of real estate to sell it to another at an agreed price, and at the same time secure the right to repurchase, the law will enforce such a transaction when actually made. Whether any criticism can be made upon anything that was said in the opinion is immaterial. The principle announced is correct, and we decline to reverse it.

4. It was urged, that Singletary did not bind himself in writing to Caroline Cowart to pay the purchase-money notes which were given by her to Mrs. Holmes; that if there was any promise to that effect, it was in parol; and that such a promise was obnoxious to the statute of frauds. In the deed to Singletary it was recited that Caroline Cowart had given her notes for the purchase-money of the land to Mrs. Holmes, and that "Singletary bonds [binds] himself to see that said bond is complied with." The acceptance of this conveyance by Singletary bound him to carry out such covenant. *Kytle* v. *Kytle,* 128 *Ga.* 387 (57 S. E. 748). As between him and

his grantor such an agreement to pay purchase-money was not within the statute of frauds. *Ford* v. *Finney*, 35 *Ga.* 258; *Gorman* v. *Wood*, 73 *Ga.* 370, 374; *Coldwell* v. *Cowart*, 138 *Ga.* 233, 243 (75 S. E. 425).

5. We now come to the only point of difference between the members of this court. The bond for title which was given by Mrs. Holmes to Caroline Cowart, after describing the terms of the sale and the notes given for the purchase-money, and binding Mrs. Holmes "to make or cause to be made" good and sufficient title in fee simple to the land upon payment of the notes, contained the following: "It is hereby understood and agreed that time is of the essence of this contract; and should the party of the second part fail to pay said notes as they become due, then this bond to become null and void, and whatever money paid shall be treated as rent at the rate of $150 per annum. And it is further stipulated that this bond is not transferable to any one." Under the facts of the case, the majority of the court are of the opinion that neither of the two clauses above quoted prevented Singletary from having equitable relief. The first clause declares time to be of the essence of the contract, and provides for a forfeiture in case of non-payment of the purchase-money. This clause does not undertake to put any restriction upon the transfer of the bond or the alienation of the property by the purchaser. There was no evidence to show that Mrs. Holmes ever claimed any forfeiture or breach of the bond arising from non-payment. On the contrary she received payment from Singletary of fifteen of the notes substantially, if not exactly, as they fell due, and received a large part of the purchase-money from Grimsley in discharge of the remaining notes before they were due. She could not, of course, claim a forfeiture and at the same time receive the purchase-money. So that any contention that there was a forfeiture and a resale without regard to the original contract finds no support whatever in the evidence. Indeed such is not the contention, but this clause is used in support of the position that there was a limited restriction on alienation, as will appear below.

The clause of the bond for title upon which this branch of the case depends is the second clause above quoted, which reads as follows: "And it is further stipulated that this bond is not transferable to any one." If the insertion of such a stipulation in the

bond for title rendered the conveyance by the obligee to Singletary absolutely void, so that he acquired no right thereunder and no equity arose in his favor by reason of the payment of a large part of the purchase-money to Mrs. Holmes, and so that Mrs. Holmes could make a conveyance to Grimsley, receiving from him the balance of the purchase-money, less what Singletary had paid, and so that Grimsley could convey a life-interest in half of the land to Caroline Cowart, and Singletary could thus be entirely left out and would have no equitable right whatever, then the finding of the auditor and the decree of the court were wrong. Otherwise they were right. There was evidence tending to show that Mrs. Holmes knew that Singletary was sending to her money to pay the notes of Caroline Cowart as they fell due, and that she accepted the money from him and delivered up the notes so paid. There was also abundant evidence to show that Grimsley knew that Caroline Cowart had made a deed to Singletary, and that Singletary had leased the place to her as his tenant; and that Grimsley was thus affected with notice that Singletary had or claimed some character of interest in the land before Grimsley took a deed from Mrs. Holmes. It is also undisputed that, in acquiring title from Mrs. Holmes by paying the balance of the purchase-money before it was due, Grimsley knew that a large part of the purchase-money had been paid, and that he was receiving the benefit of such payments, and was getting the land for such balance, and not for the entire amount stipulated in the bond. He testified in general terms that he did not know that Singletary had made these payments but thought they had been made by Caroline Cowart, but he admitted having testified on a former trial that Caroline had told him that she had made a deed to Singletary; and, as stated above, there was evidence showing that he was put on notice or inquiry as to Singletary's interest; and the auditor found against him. Hence, in considering whether the report of the auditor and the decree can be declared to be erroneous as matter of law, we must accept it as a fact that Grimsley acted with notice of Singletary's interest. Under such facts, can it be held that Singletary had no equitable rights, and that he was cut off from all relief by reason of the provision in the bond for title that it was not transferable? The argument in favor of such a position must rest substantially upon one or all of three contentions: First, that the bond obligat-

ing the maker to convey a fee-simple title upon payment of the purchase-money is to be analogized to a conveyance in fee simple, and that in such a conveyance there may be a limited and reasonable restriction upon alienation. Second, that the bond for title is to be analogized to a chose in action, which at common law was not assignable. Third, that it is to be considered as a contract between the obligor and the obligee, and that the obligor had the right to provide with whom she desired to deal, and that the contract should not be assignable.

Before taking up each of these contentions separately, it may be well to note that, strictly speaking, there was no transfer of the bond, but that the obligee made a warranty deed to Singletary. Whatever title the maker of such a deed might acquire thereafter by payment of the purchase-money would pass to her grantee. *Parker* v. *Jones,* 57 *Ga.* 204; *Isler* v. *Griffin,* 134 *Ga.* 192, 196 (67 S. E. 854); Powell on Actions for Land, § 141. By the payment of part of the purchase-money, he or she undoubtedly acquired an equitable interest, which could be conveyed. We deem it unnecessary to consider the question of whether the record of her deed carried constructive notice to Grimsley, as we have found that there was sufficient evidence to show actual notice on his part. If this conveyance by Caroline Cowart to Singletary be treated as substantially an assignment of the bond for title to him, nevertheless was it void, and did he acquire no rights thereunder or by virtue of his payment of a considerable part of the purchase-money?

The first contention stated above is dependent upon analogizing the restraint upon an assignment of a bond for title to a restriction upon alienation by the grantee in a fee-simple deed. The Civil Code, § 3657, declares: "An absolute or fee-simple estate is one in which the owner is entitled to the entire property, with unconditional powers of disposition during his life, and descending to his heirs and legal representatives upon his death intestate." This definition excludes the right to limit the power of disposition during the life of the grantee, if the estate is one in fee simple. Moreover, by section 3718 of the Civil Code it is declared: "A condition repugnant to the estate granted is void." In *Freeman* v. *Phillips,* 113 *Ga.* 589 (38 S. E. 943), it was held: "A devise giving a fee in land to remaindermen on the termination of a life-estate, with the restrictions that the remaindermen should 'never

mortgage, rent, or sell said parcel of land,' vests in such remainder-men, at the death of the life-tenant, a fee in such land free from the restrictions sought to be imposed. The restraint upon aliena-tion, being repugnant to the nature of the estate, is void." We are not dealing now with base fees, or reversions, or limitations over, or with the question whether, construing a particular con-veyance as a whole, the estate conveyed is in fact a fee-simple, or a less estate, but with conveyances in fee simple in which it is sought to restrict the right of alienation by the grantee.

If we look to authorities outside of our own code and decisions, attempts to impose general restraints on alienation in granting a fee-simple estate are held void as repugnant to the estate granted. Restraints upon alienation of leasehold interests, estates for years, and the like are held to be valid in order to protect the reversionary interest of the grantor. Some courts have held, that, coupled with the grant of a fee-simple interest, there may be a reasonable restraint on alienation for a limited time, or prohibiting a convey-ance to a particular person, or the like. The leading case in this country in which this subject is elaborately discussed is DePeyster v. Michael, 6 N. Y. (2 Selden) 467 (57 Am. D. 470). In Mandle-baum v. McDonell, 29 Mich. 78 (18 Am. R. 61), the subject was again discussed at length by Christiancy, J. He attacked vigor-ously the statement of some text-writers and judges that a grant of a fee-simple estate could be made, and at the same time the grantee could be restricted from selling such estate for a limited time. He declared that this statement had arisen from a miscon-ception of the actual ruling in Large's case, 2 Leonard, 82, and had been perpetuated by erroneous obiter dicta which had grown into positive assertion. In conclusion he said: "And we think it would be unwise and injurious to admit into the law the principle contended for by the defendant's counsel, that such restriction should be held valid, if imposed only for a reasonable time. It is safe to say that every estate depending upon such a question would, by the very fact of such a question existing, lose a large share of its market value. Who can say whether the time is reasonable, until the question has been settled in the court of last resort; and upon what standard of certainty can the court decide it? . . The only safe rule of decision is to hold, as I understand the common law for ages to have been, that a condition or restriction which would

suspend all power of alienation for a single day is inconsistent with the estate granted, unreasonable and void." See also 2 Jarman on Wills (2d ed.), 1490. This seems to accord with the definition of a fee-simple estate in our code. See also, in this connection, Manierre v. Welling, 32 R. I. 104 (78 Atl. 507, 24 Ann. Cas. (1912C) 1311, and note).

In 24 American & English Encyclopædia of Law (2d ed.), 867, it is said: "There are many dicta, as well as a few direct authorities, to the effect that restraints on alienation for a limited time are valid, but in a number of cases the validity of such restraint has been said to be doubtful; and on principle, and according to the weight of authority, a restriction, whether by way of condition, or of limitation over, or of bare prohibition against any and all alienation, although for a limited time, of a vested estate in fee, whether in possession or remainder, is void. In the case of a contingent remainder, however, or of any other interest not vested, a restriction upon the power of alienation to last as long as the interest remains contingent is valid." As stated above, we need not consider the subject of conditions or limitations over, here mentioned, as they are not now involved.

In jurisdictions where it is held that a restraint upon the right to sell a fee-simple interest for a limited time is permissible, it is generally held, that, to be enforceable, it must be coupled with a reversion or a limitation over. 1 Warvelle on Vendors (2d ed.), § 451, p. 532; Fowlkes v. Wagoner (Tenn.), 46 S. W. 586; Fowler v. Duhme, 143 Ind. 248 (42 N. E. 623, 637). In 1 Warvelle on Vendors (2d ed.), § 453, p. 533, it is said: "Restraints with respect to time have in several instances been held good and the conditions sustained, provided the restriction is limited to a 'reasonable period;' but the weight of authority would seem to be against the validity of restraints upon alienation, however limited in time." See also Gray, Restraints on Alienation (2d ed.), §§ 54, 105 et seq.

Without entering at length into the various authorities on this subject, we think it is clear that if the test applicable to conveyances of a fee-simple estate with an attempted restriction on alienation were applied to the provision of the bond for title now under consideration, it would not be valid. Even should we follow those authorities which hold that there may be a restraint upon aliena-

tion for a reasonable time, the restraint sought to be imposed in this bond is not in terms limited as to time. The preceding provision of the bond, which declares time to be of the essence of the contract, and authorizes, or seeks to authorize, a forfeiture in case of non-payment, can not help the case. It did not declare a reasonable time within which there should be no alienation; nor does it appear that the obligor in the bond has in any manner sought to declare a forfeiture. If it could be held that this amounted to a restraint upon alienation for a reasonable time, namely, until the last payment should fall due, it could only be enforced for the benefit of the obligor. And when Mrs. Holmes received the purchase-money due to her in full, she had no further right to insist on the restraint upon alienation.

The writer has dwelt at some length on the question of restraint upon alienation of a fee-simple estate, because it is an important principle in the law of real estate, and there should be no misapprehension as to it; and also because in consultation some of our brethren were of the opinion that the analogy is important, if not controlling, in the case.

In so far as the argument rests upon the rule that at common law choses in action were not assignable so as to convey title, but only an equitable interest, it is sufficient to say that this rule has been changed by our statute. In the Civil Code, § 3653, it is declared that "All choses in action arising upon contract may be assigned so as to vest the title in the assignee, but he takes it, except negotiable securities, subject to the equities existing between the assignor and debtor at the time of the assignment, and until notice of the assignment is given to the person liable." In *Bewick Lumber Co.* v. *Hall,* 94 *Ga.* 539 (21 S. E. 154), a written instrument was as follows: "Credit check $6.50. Number 687. February 20th, 1891. Issued to Aaron Hattan. Not transferable. Payable on demand in merchandise by Bewick Lumber Company. Johnsonville, Georgia. G. B. Monroe." It was held that this was a chose in action arising upon a contract, and that it was assignable, under the provisions of the code section above quoted. This ruling was made in spite of the fact that the paper contained the words "not transferable." It may be remarked, however, that this was not an executory contract containing mutual obligations. That class of contracts will be next considered.

The third ground upon which the argument rests is that parties have a right to contract, and, among other terms of a contract, to provide that it shall not be assignable; and that, as against the party who does not consent to the assignment, the assignee obtains no right.

Certain classes of contracts are inherently non-assignable in their character, such as promises to marry, or engagements for personal services, requiring skill, science, or peculiar qualifications. When rights arising out of contract are coupled with obligations to be performed by the contractor and involve such a relation of personal confidence that it must have been intended that the rights should be exercised and the obligations performed by him alone, the contract, including both his rights and his obligations, can not be assigned without the consent of the other party to such contract. The rule is sometimes stated by saying, "Contract rights coupled with liabilities, or involving a relation of personal confidence between the parties, can not be transferred to a third person by one of the parties to the contract without the assent of the other." *Tifton, Thomasville & Gulf Railway Co.* v. *Bedgood & Co.,* 116 *Ga.* 945 (43 S. E. 257). That case furnishes an illustration of the rule. The contract then before the court bound a railway company, for a sufficient consideration, to put in a side-track to connect its main line with the sawmill of a certain firm, and to transport over its railway lumber shipped by that firm at a certain rate; and it bound the firm to ship all the lumber cut by them over the company's railway, with a named exception. The firm entered upon the contract an assignment of their interest in it, and the transferee entered upon it an assignment to another firm, who sought to enforce the contract against the railway company. It was held that such a contract was not assignable without the consent of the railway company. In *Sims* v. *Cordele Ice Co.,* 119 *Ga.* 597 (46 S. E. 841), it was held that an option or contract right to purchase designated property within a given time at a stipulated price, payable in installments, and coupled with certain other agreements, upon the credit of the person owning such right, was not assignable without the consent of the other party. In *Simms* v. *Lide,* 94 *Ga.* 553 (21 S. E. 220), a contract under seal was made by the owner of land to convey it to another upon payment of a stipulated price within a given time. It recited a con-

sideration of $5. Before the end of the period mentioned the obligee in the contract agreed with another person to sell his interest in the land arising under such contract. He caused the amount of purchase-money to be tendered to the maker of the agreement, which she refused. He then filed an equitable petition, for the use of the person with whom he had contracted, to enforce specific performance. It was held by this court, that, after the obligee in the contract had elected to pay the stipulated price and had tendered it within the specified time and demanded a conveyance, specific performance might be enforced at his instance, "suing in behalf of a third person to whom he has sold all his interest in the premises or in the contract sought to be enforced." In *Perry* v. *Paschal,* 103 *Ga.* 134 (29 S. E. 703), Perry executed to Sims a paper in the following terms: "This is to certify that I have this day bargained to Jim Sims fifty acres of land off of the southeast corner of lot No. 240 in the 4th district of Terrell County, Ga. The road running from the Hayes place to Dorse Henry's being the line. I agree to make him a good title on his paying me $500. I agree to run said amount three years, provided he pays the rent promptly." Within less than a year after the making of this instrument a certain person, on behalf of Sims, tendered to Perry the principal and interest in full, and demanded that a deed be made to Sims. Perry declined to do so. Two days later Sims transferred all his interest under the paper to one Paschal. Paschal tendered to Perry the principal and interest due, and demanded a deed, which was refused. Paschal filed an equitable petition to compel specific performance. It was held that "an assignee of such an agreement, who takes it from the vendee, being thereby subrogated to all his rights, assumes, upon filing a proceeding to enforce the agreement, all his liabilities thereunder, and upon a continuance of the tender is entitled to maintain an action for specific performance of the agreement."

In *Sims* v. *Cordele Ice Co.,* supra, the two cases last cited were distinguished from the one then under consideration, on the ground that the right to purchase the property in controversy for a designated sum was neither coupled with the assumption of any further liability by the purchaser to the seller, nor did it involve any relation of personal confidence between the parties. In other words, where it was a mere matter of paying the money and taking a title,

and the money was paid or tendered, so that no further obligation remained open for performance, the contract was assignable.

In *Robinson* v. *Perry,* 21 *Ga.* 183 (68 Am. D. 455), R. and P. entered into a contract by which P. leased from R. a lot of land for five years, covenanting to build on it a comfortable cabin, and clear and keep under good fence twenty acres of the lot or more, if he chose, and at the expiration of five years to pay R. $100 for the land, and in the meantime to pay the taxes on the lot, and then the title to the land was to be made to him by R. P. assigned his interest in the land. It was held that the interest was assignable, and that the assignees might have specific performance of R. on showing compliance with the covenants to be performed by P. In these cases the question of limiting by agreement the power to assign a contract, so as to transfer both the rights and duties of the party attempting to make the assignment, was not involved. But they throw light on the question, by illustrating the difference between the assignability of an executory contract involving liabilities and mutual obligations, and one involving merely the payment of a sum of money and the taking of title, where the purchase-money is paid or tendered. This distinction is important in connection with contracts which contain a provision against assignment, as well as in regard to contracts which are non-assignable without such a provision, as will be seen later on.

It has been quite frequently said that the parties to an executory contract may in terms prohibit its assignment so that an assignee does not succeed to any rights in the contract by virtue of the assignment. This broad statement, however, is subject to certain modifications. It would hardly be held that a vendor and vendee of land could contract that the vendee should never assign or yield possession of the land sold, and thus preclude it from being seized and sold for the vendee's debts. As to a contract for the sale of land, such a provision is simply for the benefit or security of the vendor. If the vendor receives the full purchase-price, he needs no further security, and can no longer insist on a provision against alienation or assignment, the object of which was to secure such payment or to limit his dealings in regard to the sale to his vendee. If a case might arise where other rights of the vendor than the payment of the purchase-money require protection, no such fact appears in this case. The vendor may also waive such a provision by his conduct.

In Cheney v. Bilby, 74 Fed. 52 (36 U. S. App. 720, 20 C. C. A. 291), a contract for the sale of land contained a stipulation "that no assignment of the premises or of this contract shall be valid unless with the written consent of the first party, and by the indorsement of the assignment hereon." An assignment was made. Subsequently the assignee filed an equitable petition against the vendor, alleging that all of the engagements of the vendee had been promptly fulfilled. One objection raised was that if it should be conceded that the original vendee could enforce specific performance of the contract, his assignee could not do so. Caldwell, J., said: "This restraint upon the power of the purchaser to assign the contract unquestionably expired when the last purchase-money note fell due, and complete performance of the contract was tendered by the complainant. The complainant's right to a deed then became absolute. From that time the seller was a mere naked trustee of the legal title, and the purchaser or his vendee the equitable owner of the land. It was no longer any concern of the seller what the beneficial owner of the land did with it, for he no longer had any interest in it. The purchaser had the right to convey his equitable title, or assign his contract to whom he pleased, without asking Cheney's consent; and his vendee would succeed to all his rights." It was then said that the sale or assignment had in fact been ratified; and it was added: "Inasmuch, then, as the provision in question was only intended to secure the faithful performance of the agreement by the purchaser or his assignee, it would be both unreasonable and inequitable to hold that Cheney, the vendor, is privileged to take advantage of the provision, to avoid performance on his part, after the entire amount of the purchase-money has been promptly paid or tendered. We must assume, whatever may be the fact in this regard, that the provision against assigning the contract without the vendor's consent was inserted therein for an honest and legitimate purpose; that is to say, for the purpose of securing the punctual payment of the purchase-money, and a full compliance with other executory agreements, either by the original purchaser or by his assingee." In Grigg v. Landis, 21 N. J. Eq. 495, it was held, that, where it appears on the face of a contract respecting the sale of land that the prohibition of assignment is not the main purpose of the covenant but a mere incident to and security for such purpose, the contract is assignable in equity, and

29

the assignee has all the equitable rights of the assignor. It was said, that, the restriction being in the nature of a mere security for the performance of the principal covenants, such relief may be given by a court of equity as shall appear to be equitable under the circumstances of the case. See also Wagner *v.* Cheney, 16 Neb. 202 (20 N. W. 222) ; Johnson *v.* Eklund, 72 Minn. 195 (75 N. W. 14) ; Thomassen *v.* DeGoey, 133 Iowa, 278 (110 N. W. 581, 119 Am. St. R. 605).

Turning now to some of the decisions in this State, in *Street* v. *Lynch,* 38 *Ga.* 631, Burnett purchased land from Hanna, took a bond for title, and paid him a part of the purchase-money. Lynch bought the land from Burnett, paid the entire purchase-money, and took a bond for title. Burnett deposited with him the grants from the State of Georgia, and promised to return home and pay the balance of the purchase-money to Hanna and then make a deed to Lynch. Instead of doing so, Burnett sold the land to Street before he paid the balance of the purchase-money to Hanna; and Burnett and Street went to the widow and father of Hanna, who had died, and Burnett paid the balance due on the land with part of the money which Street was to pay him for the land, and at his request the Hannas made the deed, not to him for Lynch's benefit, but to Street, the subsequent purchaser. Chief Justice Brown said: "Now the whole case would seem to turn upon notice. If Street, at the time he made the purchase, had notice of the sale to Lynch, he took subject to the rights of Lynch, and held the land as the trustee for Lynch, and the most he could claim was that Lynch pay him the amount of balance of purchase-money paid by him to Hanna, when he was bound to make Lynch a deed and deliver the possession to him." In *Brown* v. *Crane,* 47 *Ga.* 483, it was held: "Where 'M' held a tract of land under bond for titles from 'W' and sold the same to 'C,' executing a bond to make a fee-simple title so soon as he obtained a title from 'W,' 'C' paying the purchase-money in full, and 'B,' with a full knowledge of these facts, confederating with others, by threats, etc., induced 'M' to sell the land and to transfer to him 'W's' bond, under which transfer 'B' procured a deed from 'W': *Held,* that a demurrer to a bill filled by 'C,' setting up the foregoing facts and praying that 'B' may be decreed to execute to him a title to said land, was properly overruled." Chief Justice Warner in the opinion said:

"The view which a court of equity will take of it is to regard the defendant as holding the legal title to the land in trust for the benefit of the complainant, who had previously purchased and paid for it, and of which fact the defendant had full knowledge at the time he purchased the land from Maulden and procured the legal title thereto to himself." In each of these cases there was no direct assignment of the bond for title held by the original vendee, but he gave an independent bond for title and received the purchase-money; and it was held that one who took with notice of that fact took subject to the right of such purchaser. In the present case, the original obligee in the bond conveyed the land by warranty deed to Singletary, and the evidence sufficiently shows that Grimsley took his deed from the obligor with notice of Singletary's rights. See also *Bryant* v. *Booze,* 55 *Ga.* 438; *Pearson* v. *Courson,* 129 *Ga.* 656, 659 (59 S. E. 907).

It is true that in the cases from which quotations are made above, the original bond for title did not contain a stipulation against a transfer. But if we are correct in the statement which we have made, that the ground on which such a stipulation can be sustained in an executory contract is for the protection of the vendor, that there was no hint of any right on the part of Mrs. Holmes requiring protection except to secure payment of the purchase-money, and that when she had been fully paid she could not further insist on such a stipulation as against the grantee of her purchaser, then, under the facts of this case, the stipulation in the bond for title had served its purpose and was no longer of force. Mrs. Holmes did no more than protect herself by such a stipulation until she received her purchase-money. She had received it in full. She conveyed her title and took up her bond for title. While she was named as a party in the action, it appears in the evidence that she died, and no administrator appears to have been made a party; so that neither she in her lifetime nor her administrator after her death appeared and sought to enforce the stipulation against assignment. The only persons who are attempting to assert priority over the rights of Singletary, and who claim that Singletary has no interest because of such stipulation in the original bond, are Grimsley, who took with notice of Singletary's rights, and sought to get advantage of the payments which had been made by the latter, and Caroline Cowart, who could not set up such a claim against her

warranty deed. In this respect the case differs from such a case as that of Lockerby v. Amon, 64 Wash. 24 (116 Pac. 463, 35 L. R. A. (N. S.) 1064, 26 Ann. Cas. (1913A) 228), if we should follow the court in speculating as to whether the vendor might have had some other need for protection operating after payment or tender of the purchase-money,—which a majority of this court are not prepared to do.

Under the facts as disclosed by the evidence, Grimsley and Caroline Cowart could not defeat Singletary's right because of the stipulation in the bond from Mrs. Holmes to Caroline Cowart that it should not be transferred.

*Judgment affirmed.* 'All the Justices concur, except

HILL, J., dissenting. I can not concur in the decision reached by my learned brethren in this case. The evidence tends to show that Mrs. Holmes owned a farm in Early county. She had leased it for a number of years to Singletary, who in turn subrented it, first to Shep Cowart, and later to his wife, Caroline. At the expiration of the lease to Singletary, Caroline Cowart, whose husband had become involved in debt, and who had formerly belonged as a slave to the parents of Mrs. Holmes, made a contract of purchase for the lot of land in controversy with Mrs. Holmes for the sum of $1,250, the latter executing to Caroline a bond for title, with the stipulation that "this bond is not transferable to any one." Singletary was a merchant and did a supply business. The Cowarts were indebted to him for supplies for the farm. Caroline, before the first purchase-money note became due, and before she had paid any of the purchase-money, executed a deed to the land to Singletary, "for and in consideration of, that A. J. Singletary will comply with the conditions of the bond she holds from Mrs. E. E. Holmes, receipt of which is hereby acknowledged." Contemporaneously with the execution of the deed, Singletary executed an instrument by the terms of which he declared that he had "leased to Caroline Cowart all of the cleared land" on the lot in controversy for a term of six years, the consideration of the lease being 1,750 pounds of middling lint-cotton payable Oct. 1st each year. It is stipulated in this lease that Singletary agrees at the "termination or end of this lease, should the said Cowart pay all rents that may be due on this lease and all other indebtedness that she may owe said Singletary, and in addition seven hundred and fifty dollars,

then the said Singletary agrees to make said Cowart a deed to said lot of land. It is distinctly understood that this is a lease contract and not a sale; but, as stated, should said Cowart at the termination of this lease pay all rents, all other indebtedness, and seven hundred dollars, the deed is to be made." The evidence of Caroline and her husband tended to show that she did not know she was executing a deed to Singletary; that they were ignorant and could neither read nor write, and were told by Singletary that the instrument was merely a "showing" or note for what they owed Singletary. The testimony of Singletary tended to deny all this, and to show that it was understood that the instrument signed was a deed. Caroline brought cotton to Singletary each fall after the lease, which, her evidence tended to show, was to be applied by him, as her agent, to the land notes of Mrs. Holmes. Singletary insists that he paid the money arising from the sale of the cotton to Mrs. Holmes on his own account as part of the purchase-money, and not on the contract of Caroline with Mrs. Holmes. He testified: "I would not say positively I wrote and told her I had bought the land or not. I would not say I wrote her that, but I wrote her to give her to understand that it was a good debt, and I would take it up; but I would not say that I wrote her and told her Caroline had deeded me the land. She knew I was paying them. She knew I wrote and told her to send them to the bank." Q. "She did not know who it was for?" A. "I don't reckon she did. I wrote and told her I would pay the notes. . . I just wrote Mrs. Holmes I would see the notes were paid." The evidence tends to show that Singletary paid a portion of the notes, the first four directly to Mrs. Holmes, and others through the bank. Caroline had possession of the first four notes paid. After a number of the notes had been paid by or through Singletary, the evidence tends to show that Caroline induced R. S. Grimsley to take up the remaining purchase-money notes, amounting to $727, which he paid to Mrs. Holmes upon Caroline's request, and Mrs. Holmes consented to, and did, execute a warranty deed to Grimsley, upon the promise of the latter to give Caroline "a home for her lifetime." After the execution of the deed from Mrs. Holmes to Grimsley, the latter executed a deed to Caroline to "a life interest" in one half of the lot of land in controversy. It is provided in this deed that in the event that the land shall be levied upon by any process whatever, or

that Caroline or Shep Cowart shall lease or sell the land, it shall revert to the grantor.

From a careful inspection of the record in this case, I think that the court erred in entering a decree requiring Grimsley to execute to Singletary a deed to the premises in dispute. I am aware of the rule that "If, after notice that another has made a contract for the purchase of land, a third person cuts in, buys it, and takes a conveyance, such person stands in the place of his vendor; and a court of equity, if it would decree a specific performance of the contract against the latter, will render a like decree against the former." *Bryant* v. *Booze, 55 Ga.* 438. But the present case is different from the *Bryant* case. There is no evidence in the instant case that Mrs. Holmes, the original vendor, ever knew that Caroline had sold to Singletary a title that she did not possess. The title was in Mrs. Holmes, and she was not bound, in selling it, to examine the records and see whether some one else claimed a title to her land. This duty may be upon a purchaser, but not upon one having the legal title and who desires to sell; and it is clear that Mrs. Holmes had the legal title. Nor is there in the record any evidence tending to show that Mrs. Holmes knew that Singletary was paying her the money for himself, but, on the contrary, Singletary testified, "I don't reckon she did" know who the money was paid for. Under the circumstances, Mrs. Holmes could not be made to execute a deed to Singletary. She had not contracted with, nor sold to him the land. She had no knowledge that he was paying her the notes as a purchaser from herself, or from Caroline. She had sold to another (Caroline), and the latter had requested that titles be made to Grimsley. How could Mrs. Holmes be made to perform specifically to Singletary when she had never contracted to do so, or in any other way become bound to do so? If she can not be made to perform specifically as to Singletary, I fail to see how her vendee can be so compelled. Mrs. Holmes's administrator was not a party to this suit.

It is argued that the assignee of the obligee in the bond stands in the shoes of the obligee; and that when part of the purchase-money is paid by the assignee, and the remainder is tendered by him to the vendor, the latter will be compelled to execute a conveyance. But the reply is that there was a restriction in the bond for title that it was not to be transferable. The assignee had notice of the

restriction; and there is authority that such restriction, if reasonable, is valid. Thus, "A condition may be imposed in a deed on the power of alienation in certain cases, as that the land shall not be conveyed before a certain date, or to a certain person." 2 Devlin on Real Estate, § 382. In the case of Grigg v. Landis, 19 N. J. Eq. 350-353, it is said: "Any person in selling his property, or making a contract for the sale, has a right to make such agreements and conditions as the purchaser will assent to, provided they are not contrary to law, or the policy of the law. It is not allowed to make property inalienable; it is contrary to the policy of the law; but it is permitted to restrain alienation for a limited time, or for certain specified purposes, or on certain conditions. . . . And there is nothing inequitable in the provision that until all arrears are paid up, and all stipulations complied with, the contract shall not be assigned, even in equity. It must be held, therefore, that the assignment made in express violation of the positive provisions of the contract is void, and the complainant claiming through such assignment is entitled to no relief in equity." In 1 Warvelle on Vendors (2d ed.), § 452, it is said: "While the general principle that the conveyance of an estate in fee-simple imports absolute ownership in the grantee, and that any restriction or condition imposed inconsistent with or repugnant to the estate so granted is void, seems to have been adopted as a universal rule of law, it has nevertheless been held in England from very early times that partial restraints may properly be annexed to a grant of the fee, and that the grantee may not disregard such partial restraint under penalty of forfeiture of his estate. This doctrine has also been recognized in some of the American States, and in a number of States it has been held that a condition not to alien to a particular person or persons is valid;" citing, Cowell v. Col. Springs Co., 100 U. S. 55 (25 L. ed. 547); Gray v. Blanchard, 8 Pick. (Mass.) 284; Jackson v. Schutz, 18 Johns. (N. Y.) 174 (9 Am. D. 195). Likewise, "Restraints with respect to time have in several instances been held good and the conditions sustained, provided the restriction is limited to a reasonable period." Id. § 453, citing, Stewart v. Brady, 3 Bush (Ky.), 623; Dougal v. Fryer, 3 Mo. 40 (22 Am. D. 458); Langdon v. Ingram, 28 Ind. 360. In the case of Lockerby v. Amon, 64 Wash. 24 (116 Pac. 463, 35 L. R. A. (N. S.) 1064, 26 Ann. Cas. (1913A) 228), the

defendants entered into a written contract whereby they agreed to sell S. certain real estate. A cash payment was made, and the remainder was to be paid on or before two years after the date of the contract, with interest at eight per cent. per annum. It was provided in the contract that the "parties of the first part will sell to the said party of the second part, his heirs and assigns." It was also provided that if the purchase-money was paid according to the intent and tenor of the contract, then the parties of the first part were to make a warranty deed to the premises to the party of the second part. It was further provided that "no assignment of this agreement shall be valid without the consent and signature of W. R. Amon and Sarah M. Amon, his wife, the parties of the first part." The contract was afterwards assigned by the obligee to J., who tendered the full amount due under the contract and demanded a deed. On being refused, he brought suit to compel specific performance. A judgment of dismissal was entered on the ground that the contract was not assignable. The Supreme Court of that State affirmed the judgment, holding: "A provision in a conditional-sale contract of real estate that it shall not be assigned without the consent of the vendor is valid, and an assignee without such consent secures no enforceable rights under the contract." In answer to the argument in that case that the restriction against alienation was designed only to insure payment of the purchase-money, and, *that* being tendered, there could be no reason for withholding the deed, Chadwick, J., well said: "These arguments are not new, and find some support in the authorities; but they have been rejected by a majority of the courts. The privilege of selecting a grantee is an incident of ownership, and we can not presume, as did the Supreme Court of Minnesota, that 'at most this stipulation against an assignment is merely collateral to the main purpose of the contract, designed as a means of securing and enforcing payment of what was undertaken by the vendee, to wit, the prompt payment of the purchase-money. When the vendor has received all his purchase-money, he has received all that he is entitled to, and all that the provision against an assignment was intended to secure.' Johnson *v.* Eklund, 72 Minn. 195, 75 N. W. 14. While this reasoning is entitled to consideration, we can not accept it as the end of the law. A vendor may have confidence that his vendee will not use the property to his disadvantage. It is his privilege to

decline to deal with strangers. Or he may, by limiting the right of assignment, save any question as to the interest of intervening third parties, a result not altogether unlikely under our community property system. Or he may be unwilling to assume to pass upon the legal sufficiency of an assignment." And in the case of City of Omaha *v.* Standard Oil Co., 55 Neb. 337 (75 N W. 859), it was said: "It [the assignment of the bond] compelled the city to deal with strangers, and to determine, at its peril, which of the contracting claimants was entitled to the fund. This may have been one of the very contingencies contemplated by the city, and against which it sought to provide by making the contract non-assignable." And see note to Mueller *v.* Northwestern University, 88 Am. St. R. 201 (195 Ill. 236, 63 N. W. 110) ; 4 Cyc. 20. In Langdon *v.* Ingram, 28 Ind. 360, it was held: "A condition that a grantee or devisee shall not alienate for a particular time, or to a particular person, is good."

But it may be insisted that such a restriction as that contained in the bond in the present case, against alienation of the bond for title, is against public policy and void, unless by the terms of the restriction there is a limitation over of the property, or a forfeiture of the rights of the obligee in case of alienation; and there is some authority to that effect. But if a restriction against alienation, without a clause of forfeiture, is void as being against public policy, I fail to see why it is not equally so when there is a provision for forfeiture in case of alienation; for the foundation of this rule of public policy is that the public welfare demands that there be freedom to dispose of what one owns, and there is as much restraint on disposition where a forfeiture is imposed as when there is simply an agreement not to transfer.

Nor is the restriction void in this case because it amounts to a perpetuity. Under my construction of the bond for title, it can not be transferred until the time when the last purchase-money note is paid, and I think that this is a reasonable time within which to limit alienation. And, as held in many jurisdictions, a contract in restraint of alienation is not void if not unreasonable. An option in a lease to be exercised within fifteen years has been held not void as against perpetuities. 1 Page on Contracts, § 382. Any other rule than this would deprive two or more persons of the right to contract; and this itself would be contrary to public

policy. Two or more persons may contract without let or hindrance, provided the contract does not contravene some rule of law or of public policy. It is the right of every one to contract with whomsoever he pleases. And to hold that one can not so contract, within the limitations above specified, would be to deprive him of a constitutional right. One has the right to select the person with whom he deals, and to restrict the time of payment named in a contract to a reasonable time and prohibit alienation within such time; and that is only what this contract does. What was the effect of the restriction in the bond? If a reasonable condition imposed in a deed is valid, a similar one in a bond for title would likewise be valid. The effect of the condition in this bond was that there could be no transfer of the bond, or a conveyance of the land in controversy by the obligee in the bond until the last purchase-money note was paid; and this, I think, was a reasonable condition. The evident purpose of the vendor was to secure a home to her old servant, Caroline, and she was not to alienate or transfer the bond until it matured and the vendor could execute to her a deed to the land. The restriction as to alienation was limited, at all events, to a period of about six years, the maturity of the last note, as the bond stipulated that "time is of the essence of this contract; and should party of the second part fail to pay said notes, as they become due, then this bond becomes null and void, and whatever money is paid shall be treated as rent at the rate of $150 per annum." It follows from what has been said, that Caroline could not alienate or transfer the bond before the last note was due, and whosoever took a deed from Caroline before that date, with notice of the condition in the bond, was bound by that condition; and having no power to transfer the bond, she certainly could have no power to convey the land before the time stipulated in the bond. Therefore, when Singletary took the deed with notice of the condition in the bond, he acquired no right contrary to the condition.

This case is very different from the *Bryant* case, supra, where a third person had "cut in" to deprive a purchaser of his trade. In the view I take of the case, at the time Grimsley purchased the land from Mrs. Holmes, Singletary had not effected a legal contract of purchase of the land from Caroline, on account of the restriction in the bond providing that she could not alienate it, or with Mrs.

Holmes; and hence Grimsley had the legal right to purchase from any one having the legal right to sell. Mrs. Holmes never having parted with the legal title to Caroline, nor having sold to Singletary so far as the evidence discloses, and Caroline having no right to sell to Singletary, Grimsley had the right to purchase from Mrs. Holmes, with the consent of Caroline that her contract with the obligor be canceled; and having done so, Grimsley secured a good title relatively to Singletary and Caroline. While it is true Grimsley had notice of the deed from Cowart to Singletary, he also had notice of the restriction in the bond. It may be that Caroline is liable to Singletary on her warranty, if she executed the deed to him, as the auditor finds that she did, and that she is estopped from setting up that she had no title to the land; but I think there is no privity as between Grimsley and Singletary; and consequently the court could not, for the reasons given above, compel Grimsley to execute a deed to Singletary, or enter a decree canceling the deed from Mrs. Holmes to Grimsley, or enter a judgment for any amount against Grimsley.