**Robert CLARK, Jr., Plaintiff-Appellant,**

v.

**UNION MUTUAL LIFE INSURANCE COMPANY, Defendant-Appellee.**

No. 82–8242.

United States Court of Appeals,
Eleventh Circuit.

Dec. 6, 1982.

Rehearing Denied Jan. 10, 1983.

Hazleton & Sweet, John F. Sweet, Kathleen L. Wilde, Atlanta, Ga., for plaintiff-appellant.

Mark A. Dickerson, Asst. Atty. Gen., Atlanta, Ga., amicus curiae.

Powell, Goldstein, Frazer & Murphy, Daryll Love, Anthony L. Cochran, Allen S.C. Willingham, Atlanta, Ga., Cline, Hallissey & Hausman, Mineola, N.Y., for defendant-appellee.

Appeal from the United States District Court for the Northern District of Georgia.

Before FAY and HATCHETT, Circuit Judges, and MORGAN, Senior Circuit Judge.

FAY, Circuit Judge:

Plaintiff, Robert Clark, Jr., brought this diversity action against Union Mutual Life Insurance Company ("Union Mutual"), contesting the allegedly wrongful termination of his major medical benefits under a group insurance plan provided by his employer, the Leukemia Society of America ("Leukemia Society"), and issued by Union Mutual. Both parties moved for summary judgment.

The trial court denied plaintiff's motion for summary judgment; it granted defendant Union Mutual's motion for summary judgment and ordered the entry of judgment accordingly. The plaintiff appeals. We reverse the district court's grant of Union Mutual's motion for summary judgment.

## I.

Although some of the facts are in dispute, this much is uncontested: Clark was Executive Director of the Georgia Chapter of the Leukemia Society from 1970 until 1976. The Leukemia Society provided its employees with major medical benefits, together with disability and life insurance, under a group plan with Union Mutual. Clark was a member of the group covered by that plan.

In 1976, Clark contracted multiple sclerosis, a progressively degenerative disease. Clark was forced to cease active work in December of 1976, although he was carried on the payroll until mid-1977.

The Leukemia Society agreed with Union Mutual to continue Clark as a covered employee. Accordingly, the Leukemia Society has continued to pay premiums for the appellant since his retirement. Until June of 1978, the maximum excess disability benefits available under the group plan were $30,000.

In 1978, by amendment to the contract between Leukemia Society and Union Mutual, the maximum for major medical benefits was raised to one million dollars. Booklets, known as "Certificates of Coverage," prepared by Union Mutual were provided to Leukemia Society. Leukemia Society distributed the certificates evidencing the new benefits to all covered employees, including Clark. The covered employees did not receive copies of the master policy, only Leukemia Society and Union Mutual have copies.

The amendment to the policy set forth a number of "provisions, limitations and exclusions" applicable to the new extended coverage. At the bottom of the amendment, separated by a blank space from the rest of its provisions, it contained the following language:

The effective date of this amendment is June 1, 1978, but only with respect to disabilities commencing (a) on or after such date and (b) while the person is insured in accordance with the terms and provisions of the Policy.

The certificate of insurance recounted the same limitations and exclusions but did not contain the above language excluding pre-existing disabilities.

Union Mutual paid Clark's major medical expenses for all of the period from 1976 to 1981. From 1976 to 1979, while Clark was ambulatory, his major medical expenses were minimal, totalling less than $1,000 per year. In August, 1980, however, when Clark lost virtually all of his muscle control, his major medical expenses rose to $2,000 per week.

In February, 1981, major medical benefits paid for Clark reached $30,000. Between February and June, 1981, Union Mutual continued to accept premiums from Leukemia Society for Clark's major medical coverage, and paid out over $35,000 for additional major medical expenses.

On May 28, 1981, Union Mutual informed Clark that his benefits would be stopped effective June 1, 1981. On June 16, 1981, Clark filed a complaint and affidavit in the Superior Court of Fulton County, Georgia, against Union Mutual and Leukemia Society, alleging wrongful termination of his major medical benefits, and seeking an interlocutory injunction restoring said benefits pending a final determination on the merits. On June 24, 1981, Union Mutual removed this case to the United States District Court for the Northern District of Georgia on diversity grounds. On July 24, 1981, the district court granted Clark's Application for a Preliminary Injunction.

On September 24, 1981, Clark dismissed his complaint against the Leukemia Society. At the court's suggestion, Union Mutual and Clark each moved for summary judgment. On March 31, 1982, the district court granted Union Mutual's motion for summary judgment and dissolved the preliminary injunction. Clark appealed the grant of Union Mutual's motion for summary judgment.

## II.

Summary judgment should be entered only if "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). *See Clemons v. Dougherty County, Georgia,* 684 F.2d 1365, 1368 (11th Cir.1982); *Impossible Electronics Techniques, Inc. v. Wackenhut Protective Systems, Inc.,* 669 F.2d 1026, 1030 (5th Cir. 1982). "In reviewing a decision granting or denying summary judgment, this court applies the same legal standards as those that control the district court in determining whether summary judgment is appropriate." *Clemons,* at 1368, *citing Environmental Defense Fund v. Marsh,* 651 F.2d 983, 991 (5th Cir.1981); *United States Steel Corp. v. Darby,* 516 F.2d 961, 963 (5th Cir. 1975).

The party seeking summary judgment bears the exacting burden of demonstrating that there is no dispute as to any material fact in the case. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Marsh,* 651 F.2d at 990–91. "In assessing whether the movant has met this burden, the courts should view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. *Clemons,* at 1368. "All reasonable doubts about the facts should be resolved in favor of the non-movant. *Id.,* at 1369. A trial court must not decide any factual issues it finds in the record; if factual issues are present, the court must deny the motion and proceed to trial. *Id.; Marsh,* 651 F.2d at 991; *Lighting Fixture & Electric Supply Co. v. Continental Insurance Co.,* 420 F.2d 1211, 1213 (5th Cir.1969). Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts. *Clemons,* at 1369; *Lighting Fixtures & Electric Supply Co.,* 420 F.2d at 1213. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment. *Clemons,* at 1369; *Impossible Electronics Techniques, Inc.,* 669 F.2d at 1026.

Applying these principles to the instant case, we find that the district court erred in granting Union Mutual's motion for summary judgment. After reviewing the pleadings, depositions, and affidavits, we cannot conclude, as the district court concluded, that "Clark was not entitled to recover under any theory ..." as a matter of law. (R., Order of March 31, 1982 ("Order"), p. 13) [1]

---

1. At the outset, we find that the district court properly determined that New York insurance law should apply under the Georgia conflicts rule. The state of New York was the place of the delivery of the insurance contract and the application of New York law does not violate the public policy of the state of Georgia.

Clark makes several arguments in support of his claim of million dollar coverage. First, Clark argues that the master policy amendment which raised the major medical maximum to one million dollars, cannot be construed to exclude him from coverage despite his pre-existing disability. Second, he argues that even if the master policy as amended is construed to deny him coverage, Union Mutual must be barred on equitable grounds of waiver and estoppel from limiting his coverage to any amount less than one million dollars, since notice of his exclusion from the million dollar coverage was omitted from his certificate.

Turning to Clark's first argument, the language of the master policy amendment states that "[t]he effective date of this amendment is June 1, 1978, but only with respect to disability commencing (a) on or after such date...." Although Clark admits that he was disabled well before June 2, 1978, he nevertheless contends that the amendment was effective as to him. Guided by the rule that an insurance contract that is clear and unambiguous must be enforced by the courts under its terms, the district court found, contrary to Clark's assertions, that the language of the effective date clause was not ambiguous, and therefore

> [i]t was an inescapable conclusion, from the language used and the context, that amendment 10 provided an effective date that retroactively started coverage for excess major benefits on June 1, 1978, but only for major medical expenses arising from disability commencing after that date. Payments for major medical expenses arising from disability that existed prior to June 1, 1978, had no effective date, and were not covered under the amendment.

(R., Order of March 31, 1982, p. 5). After reviewing the entire insurance contract and amendment ten, we find no reason to disturb

■ Clark's claim of estoppel is based on discrepancies between amendment ten as contained in the master policy, and the version of amendment ten summarized in the rider to the certificate. The principal discrepancy is that the certificate rider summarizes the effective date of the master policy amendment as follows:

The effective date of this Rider shall be June 1, 1978, or the effective date of the certificate to which it is attached, whichever is later.

The certificate rider fails to indicate that no increase in excess disability benefits would be effective as to persons with disabilities pre-existing June 2, 1978. "What is particularly misleading about this omission is that the other amendments with effective date clauses excluding preexisting disabilities *were* summarized in the certificate riders as applying only with respect to disabilities commencing on or after' the given effective date." (R., Order at 8) (emphasis in original).

Clark argues that the omission of the "pre-existing disability exclusion" from the certificate of insurance rendered the provision unenforceable. Clark relies on N.Y. Ins. Law § 162(1)(f), which provides that

an insurer shall issue to the employer ... for delivery to each member of the insured group, a certificate setting forth in summary form a statement of the essential features of the insurance coverage of such employee or such member....

Section 162(3) further provides that

exceptions of the policy shall be printed in the policy and in the certificate, with the same prominence as the benefits to which they apply.

■ In response, Union Mutual contends that under New York insurance law the certificate is expressly made subject to the terms and conditions of the master policy, and in the case of any conflict or ambiguity the master policy controls. Union Mutual cites as authority for its position N.Y. Ins. Law § 142 (McKinney 1966), which provides that a certificate ordinarily is merely evidence of insurance and is therefore governed by the master policy. The amendment to the master policy raising the maximum for excess disability benefits to one million dollars specifically provides that "[t]he effective date of this amendment is June 1, 1978, but only with respect to disabilities commencing (a) on or after such date...." Thus, Union Mutual argues, the appellant's contention that the certificate of insurance with the omitted "disability exclusion" created one million dollar excess disability coverage for him, or estopped Union Mutual from asserting the defense of noncoverage is unfounded as a matter of

---

the district court's determination that under the terms of amendment ten itself, Clark is not covered by the excess major medical benefits increase for payments arising from his multiple sclerosis.

Clark's claim of waiver is based primarily on two factors: First, although Union Mutual asserts that it had paid the $30,000 major medical benefits it was required to pay by mid-February, 1981, additional payments to Clark, totalling over $35,000, continued until May 28, 1981. Second, Union Mutual continued to accept premiums from Leukemia Society on Clark's behalf after amendment ten was signed, and possibly after February 1981 as well.

After reviewing the record, we agree with the district court's disposition of the waiver claim:

As to the payment of premiums, it does not appear to the court that premiums were not owed. Amendment ten excludes excess major medical benefits coverage for *disabilities* preexisting June 1, 1978, not for *persons* disabled prior to June 1, 1978. If Clark were to be stricken with an illness that did not preex-

ist June, 1978, and was unrelated to his multiple sclerosis, he would presumably be covered.

Additionally, Clark was a covered person under the $30,000 major medical benefits policy until February, 1981, and he remained covered under various other Union Mutual policies even to this date. The plaintiff has not explained why a premium would not be due at least through February on this basis alone. That LSA may have been billed for, and paid, excess premiums for Clark's coverage from February to May, is not a sufficient basis to apply the doctrine of waiver to require further payments over the policy limit. *Dobbs, supra; Simpson, supra. See also Van Ostrand v. National Life Assurance Co.,* 82 Misc.2d 829, 371 N.Y.S.2d 51 (1975) (premiums paid and accepted, but no waiver).

Union Mutual is not required to conduct its business without error. A waiver must be intended as a waiver.

(Order, at 7–8) (emphasis in original, footnote omitted).

law. As asserted by Union Mutual throughout this litigation, the doctrine of estoppel cannot be used to extend the coverage of an insurance policy or create a primary liability. *Appellee's Brief* at 25–27, *citing Chrapa v. Johncox,* 401 N.Y.S.2d 332, 60 A.D.2d 55; *Simpson v. Phoenix Mutual Life Insurance Company,* 291 N.Y.S.2d 532, 30 A.D.2d 265, aff'd, 299 N.Y.S.2d 835, 24 N.Y.2d 262, 247 N.E.2d 655 (1968). We find the insurance company's reliance on the proposition "estoppel cannot create coverage" unpersuasive as well as perplexing,[2] since it is well-established under New York insurance law that estoppel can be applied to prevent an insurer from asserting valid defenses or exclusions to coverage:

> While it is said that insurance contracts cannot be created by estoppel, 16A Appleman, Insurance Law and Practice 339, § 9090; 44 C.J.S. Insurance § 275(a)(1), p. 1091 no New York case on either side of that precise question has been found, but see *Simpson v. Phoenix Mut. Ins. Co.,* 30 A.D.2d 265, 268, 291 N.Y.S.2d 532, 536, affd. 24 N.Y.2d 262, 299 N.Y.S.2d 835, 247 N.E.2d 655; *Callahan v. Amer. Motorists Ins.,* 56 Misc.2d 734, 289 N.Y.S.2d 1005; *Horrmann v. Prudential Ins. Co.,* 192 Misc. 758, 81 N.Y.S.2d 218. There are New York cases recognizing that an insurer under an issued policy may be estopped to assert noncoverage, *O'Dowd v. American Surety Co.,* 3 N.Y.2d 347, 165 N.Y.S.2d 458, 144 N.E.2d 359; *Schultz & Co. v. Camden Fire Ins. Assn.,* 304 N.Y. 143, 106 N.E.2d 273; *Moore Constr. Co. v. U.S. Fidelity & Guarantee Co.,* 293 N.Y. 119, 56 N.E.2d 74, 153 A.L.R. 952; *Gerka v. Fidelity & Casualty Co.,* 251 N.Y. 51, 167 N.E. 169; see Annots: 1 A.L.R.2d 1148, or a defense such as non-coopera-

tion, see Annot: 70 A.L.R.2d 1197. Such an estoppel is provable under a general denial, *Feinberg v. Allen,* 208 N.Y. 215, 101 N.E. 893, but must be established by the person claiming it by a preponderance of the evidence, *Gibson El. Co. v. Liverpool & L.G. Ins. Co.,* 159 N.Y. 418, 427, 54 N.E. 23, 26; see Annot: 4 A.L.R.3d 361.

*Government Employers Ins. Co. v. Giugno,* 61 Misc.2d 1092, 308 N.Y.S.2d 45, 47 (1970).

Despite occasional broad language that the master policy always controls, the New York courts have shown themselves willing to apply estoppel doctrines to protect an insured who has relied on a certificate, instead of investigating the appropriate master policy. In *Avco Installment Sales Co. v. Edge,* 83 Misc.2d 1011, 371 N.Y.S.2d 230 (1975), the assignee of the purchase price and various finance charges for a television set brought an action against the purchaser of the set for the unpaid purchase price, and the purchaser sought recovery against the third-party defendant insurer that had issued a policy covering loss of the set through burglary. The insurance company rested its entire defense upon its master policy, the document referred to in the certificate of insurance issued to the third-party plaintiff. "The language on the face of the Certificate state[d] that 'this coverage is provided by the Master Policy issued by the Balboa Insurance Company. The Master Policy contains a more detailed description of the perils covered and exceptions and is available for inspection at your request.' The Certificate further stated that the merchandise purchased by [the third-party] plaintiff was insured against 'burglary.' There was no definition of that term contained in the Certificate and no express

---

**2.** As aptly noted by the district court:

> Union Mutual has placed heavy reliance on the statement that 'estoppel cannot create coverage,' *see Simpson, supra.* Taken literally this statement makes very little sense in light of the fact, readily conceded by Union Mutual, that estoppel can be applied to prevent an insurer from asserting valid defenses or exclusions to coverage based, for example, on a failure to comply with notification procedures. Obviously, when an otherwise valid exclusion or defense bars coverage, estopping reliance on that exclusion or defense has

the effect of creating coverage. In this court's view, the statement that 'estoppel cannot create coverage' is intended to restate the traditional requirement of equitable estoppel that there must be such conduct on the part of the insurer as would, if it were not estopped, operate as a fraud on the party who has taken or neglected to take some action to his own prejudice in reliance upon it. *Joseph Schultz & Co. v. Camden Fire Insurance Ass'n,* 304 N.Y. 143, 147, 106 N.E.2d 273, 275 (1952).

(Order, at p. 11.).

limitations on the coverage represented by the Certificate other than the reference to the Master Policy." 371 N.Y.S.2d at 232. The trial judge held that this failure by the insurer to reveal to the insured restrictions contained in its master policy, both as to the definition of "burglary" and the time within which suit on the policy was to be brought, estopped the insurer from invoking such limitations. We find the reasoning of the court particularly appropriate in this instance and quote at length:

> The failure of Balboa to advise the defendant of its Master Policy limitations period and of its own definition of the *kind* of burglary it insured against must be equated with an implied invitation to the defendant to rest assured that the only contract between insured and insurer was the company's Certificate of Insurance. 'The history of statutory insurance clearly indicates that standard policies were made obligatory upon insurance companies to protect ingenuous insureds against the refinements and legalisms devised by the companies. Whenever the Legislature stepped into this area its purpose was to afford the insured more protection and less obfuscation.... We are on firm ground then when we say that primarily, standard policies are for the safeguarding of policy holders.' (*Conte v. Yorkshire Insurance Company,* 5 Misc.2d 670, 671, 163 N.Y.S.2d 28, 29).
>
> This is doubtless the reason for the rule laid down in *Lachs v. Fidelity and Casualty Company of N.Y.,* 306 N.Y. 357, 118 N.E.2d 555, that it is incumbent upon an insurer to give clear notice of non-coverage in order to enforce non-coverage conditions. While *Lachs, supra,* considered a flight insurance policy, the reasoning is applicable here and it is a reasoning to which Balboa paid absolutely no heed. By not exhibiting to defendant its Master Policy and by not specifically stating to the defendant, at the time the claim was rejected, that the Master Policy defined burglary in a specific and limited manner, and by not telling defendant, further, that the same Master Policy contained a twelve months period of limitations, Balboa was, in effect, retreating behind

phantom conditions never present in the defendant's Certificate of Insurance.

> . . . .

> [I]t is obvious that the Certificate of Insurance issued to the defendant says that the merchandise purchased by him was 'insured against loss by ... burglary,' without any modification of that term. This court will not permit the insurer to superimpose upon the contract represented by the Certificate of Insurance some secret reservation hidden away in another document. A more candid practice would have been for the insurer to exhibit to defendant its Master Policy from the outset, or certainly, at the time the claim was rejected, so that the insurer's more refined definition of what it really meant by 'burglary' would stand revealed. Absent such a dutiful act, defendant was entitled to accept the term 'burglary' in the usual connotation which that term has for a layman. 'A contract of insurance, drawn by the insurer, must be read through the eyes of the average man on the street or the average housewife who purchases it.' (*Lachs v. Fidelity and Casualty Co. of N.Y., supra,* at p. 364, 118 N.E.2d at p. 558.)

> . . . .

> Suffice it to say that, having given the defendant its Certificate of Insurance, Balboa was bound by the text of that document. No duty was imposed upon the defendant, either directly or impliedly, to demand inspection of the Master Policy. To impose such a burden upon a layman, would be to assume some expert ability in him to read, to compare and assess specialty language and the meanings to which such words of art are susceptible. General principles of waiver and estoppel now operate to bar Balboa from intruding its Master Policy by way of avoiding the loss suffered by defendant.

After carefully reviewing *Avco Installment Sales Co.* and similar cases where the New York courts have invoked estoppel doctrines to protect an insured who has relied on a certificate, we agree with the district court's assessment of New York insurance law:

This court has made an extensive review of New York group insurance cases. Pursuant to its diversity jurisdiction mandate, this court believes the New York courts would follow the general approach suggested in *Van Ostrand v. National Life Assurance Company of Canada,* 82 Misc.2d 829, 371 N.Y.S.2d 51 (1975).

The approach suggested in *Van Ostrand* is the traditional approach to group insurance contract interpretation. Under this approach, relationships of the insurer and certificate holder are as follows. Pursuant to Insurance Law § 162 the insurer must prepare a certificate setting forth the essential features of the master policy for distribution to any covered persons. Pursuant to § 142 and case law such as *Ayotte; supra,* the master policy would ordinarily control.

However, if the certificate contained significant discrepancies from the master policy, and a covered person reasonably relies to his detriment on a statement in the certificate, a court will not hesitate to apply the traditional equitable principle of estoppel in order to prevent the insurer from denying the existence of coverage which the certificate indicates was available. The mere fact that a certificate refers a covered person to the master policy would not, in and of itself, prevent an estoppel, although it would be highly significant factor in determining whether or not a covered person's reliance was in fact reasonable.

Following the approach suggested in *Van Ostrand,* the district court held that as a matter of law Clark was not entitled to recover on an estoppel theory based on the discrepancies between the certificate and the master policy:

Under the approach taken in *Van Ostrand,* the plaintiff is not entitled to recover on an estoppel theory based on discrep-

ancies between the certificate and the master policy here. First, Clark had special reason to know that determination of insurance benefits was a complex affair, and blind reliance upon the booklet was not sufficient. It is clear from the record that Clark took part in several meetings concerning his insurance coverage with members of the [Leukemia Society] central LSA staff [sic] before his disability forced him to cease active work. In addition, Clark received letters from [Leukemia Society] in which it was made clear that determination of the scope of coverage under the master policy could be a tedious affair, requiring consultation with [Leukemia Society's] insurance advisors as well as with Union Mutual.

Second, the plaintiff has failed to show that he took some action to his own prejudice in reliance upon the summarized version of amendment ten contained in his certificate booklet. Exclusion for pre-existing illnesses is almost invariably a part of any insurance; there is nothing to indicate that Clark was entitled to think otherwise. *See Gillette v. Heinrich Motors, Inc.,* 44 N.Y.2d 661, 390 N.Y.S.2d 330 (1978) (Fuchsberg, J., dissenting) Furthermore, even if the booklet had been perfectly clear that the plaintiff was not covered by amendment ten, it does not appear that there was anything that the plaintiff could have done to obtain insurance elsewhere, or to invest his assets to equal the million dollar coverage, or even the approximately $100,000 over the policy limit already paid by Union Mutual.

(Order, at 12–13).

There are two deficiencies in this ruling. First, looked at in the light most favorable to the party opposing the motion, it could be inferred that Clark reasonably relied on the provisions of the certificate and not, as the trial court inferred, that he blindly relied on the certificate.[3] Support for this

---

**3.** As aptly noted in § 2727 of Wright, *Federal Practice and Procedure:*

Because the burden is on the movant, the evidence presented to the court always is construed in favor of the party opposing the motion and he is given the benefit of all favorable inferences that can be drawn from

it. . . . Facts, asserted by the party opposing the motion, if supported by affidavits or other evidentiary material, are regarded as true.

. . . .

The burden on the nonmoving party is not a heavy one; he simply is required to show specific facts, as opposed to general allega-

inference can be found in the facts adduced by Clark. Taken as true, these facts establish that after receiving the certificate which on its face showed him eligible for one million dollars in major medical benefits, Clark contacted the Leukemia Society to confirm his coverage under the new one million dollar maximum. In addition, Clark stayed in "touch with the agencies which provided the [twenty-four] hour nursing care he required, and learned that each had been told that he was covered up to [one million dollars]."

Second, the district court found that Clark had failed to make an adequate showing that he took some action to his own prejudice in reliance upon the summarized version of amendment ten contained in the rider certificate. The district court further found that "even if the certificate had been clear that Clark was not covered by amendment ten, it does not appear that there was anything that Clark could have done to obtain insurance elsewhere, or to invest his assets to equal the million dollar coverage...." These findings make apparent the trial court's misunderstanding of its limited function when considering this motion for summary judgment.

As earlier discussed, the principal judicial inquiry required by Rule 56 is whether a genuine issue of material fact exists. If no such issue exists, and the only question is what legal conclusions are to be drawn from an established set of facts, the entry of summary judgment is proper. Conversely, if the facts have not been sufficiently developed to enable the court to be certain that it is making a correct determination of the law, or the decision of a question of law by the court depends upon an inquiry into the surrounding facts and circumstances,

then summary judgment should not be entered.

In the instant case, in order to determine whether Clark could recover on an estoppel theory, the district court made factual inquiries and factual determinations. The court determined that the appellant did not reasonably rely on the provisions of the certificate. It also found that the appellant did not rely to his detriment on the certificate. The question whether Clark reasonably relied to his detriment on the summarized version of amendment ten as contained in the certificate is a disputed material issue of fact that should be resolved at trial.[4] We take care to emphasize that when faced with a motion for summary judgment "it is no part of the [trial] court's function to decide issues of fact but solely to determine whether there is an issue of fact to be tried." *Toebelman v. Missouri-Kansas Pipe Line Co.*, 130 F.2d 1015, 1018 (3d Cir. 1942). "Under the rule dealing with summary judgment, no margin exists for the disposition of factual issues, and the summary judgment procedure does not serve as a substitute for a trial of the case." *Frey v. Frankel*, 361 F.2d 437, 442 (10th Cir. 1966); *Impossible Electronics Technique*, 669 F.2d at 1031; *Marsh*, 651 F.2d at 991; *Cole v. Chevron Chemical Co.*, 427 F.2d 390, 393 (5th Cir.1970), cert. denied, 414 U.S. 858, 94 S.Ct. 67, 38 L.Ed.2d 109 (1973). As noted by the late Judge Hutcheson of the former Fifth Circuit:

> Summary judgment procedure is not a catch penny contrivance to take unwary litigants into toils and deprive them of a trial, it is a liberal measure, liberally designed for arriving at the truth. Its purpose is not to cut litigants off from their

*Id.* at 528–540 (footnotes omitted).

4. "Usually the question of estoppel is for the jury except where, [unlike] this case, the facts presented leave but one inference; then it becomes a question of law." *Ehret Company v. Eaton, Yale & Towne, Inc.*, 523 F.2d 280, 283 (2d Cir.1975); *See, Bohannon v. Manhattan Life Ins. Co.*, 555 F.2d 1205, 1211 (5th Cir. 1977); *L.W. Foster Sportswear Co. v. Goldblatt Bros., Inc.*, 356 F.2d 906, 909 (7th Cir.1966).

tions, that present a genuine issue worthy of trial. According to the Supreme Court:

> It is true that the issue of material fact required by Rule 56(c) to be present to entitle a party to proceed to trial is not required to be resolved conclusively in favor of the party asserting its existence; rather, all that is required is that sufficient evidence supporting the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial.

right of trial by jury if they really have evidence which they will offer on a trial, it is to carefully test this out, in advance of trial by inquiring and determining whether such evidence exists.

*Whitaker v. Coleman,* 115 F.2d 305, 307 (5th Cir.1940).

Additionally, the district court's finding that Clark suffered no "detriment" from his reliance on the provisions of the certificate was made despite the sworn affidavit of the appellant. In his affidavit, Clark testified that he did not exercise his option to convert a direct pay plan with Blue Shield, an option that was available to him at the time without a physical examination, because he was told he would be covered under the new plan; he further testified that he would not have depleted his personal assets at the rate he did before May of 1981, had he not relied on his one million dollar coverage. For purposes of summary judgment the trial court should have regarded these averments as true. In doing so, it would have seen that these facts permit the inference that appellant Clark relied to his detriment on the provisions of the certificate. For these reasons, the district court's holding that there were no fact issues as to whether appellant Clark reasonably and detrimentally relied on the provisions of the certificate cannot stand.

### III.

Because the district court erred when considering the motions for summary judgment on the appellant's estoppel claim by resolving factual disputes, and because genuine issues of material fact exist that preclude summary judgment, we REVERSE the judgment of the district court and REMAND for further proceedings not inconsistent with this opinion.