**In the Matter of Craig Loren ALBRACHT, Debtor.**

**Craig Loren Albracht, Plaintiff,**

**v.**

**Hamilton State Bank, as Assignee of Douglas County Bank, Defendant.**

**Bankruptcy No. 12–12360–WHD. Adversary No. 12–1061.**

United States Bankruptcy Court, N.D. Georgia, Newnan Division.

Signed Dec. 20, 2013.

J. Nevin Smith, Smith Conerly LLP, Carrollton, GA, for Plaintiff.

David R. Sicay–Perrow, Sicay–Perrow, Knighten, Bohan, P.C., Atlanta, GA, for Defendant.

*ORDER*

W. HOMER DRAKE, Bankruptcy Judge.

The above-styled Chapter 11 case comes before the Court on Cross–Motions for Summary Judgment (hereinafter collectively the "Motion(s)"), submitted by Craig Loren Albracht (hereinafter the "Debtor" or "Movant") and Hamilton State Bank, successor in interest to Douglas County Bank [1] (hereinafter the "Creditor" or "Respondent"). The Motions were filed in relation to the Debtor's *Complaint for Declaratory Judgment and Other Relief* (hereinafter the "Complaint") filed on September 10, 2012, seeking a determination by the Court as to the validity and extent of an allegedly secured lien attached to certain property of the Debtor. By virtue of 28 U.S.C. §§ 1334 and 157(a), this Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 157(b)(1) as a core proceeding defined under 28 U.S.C. §§ 157(b)(2)(K). Accordingly, this Court has the statutory and constitutional authority for hearing and determining this matter. *Stern v. Marshall,* —— U.S. ——, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).

*INTRODUCTION.*

The case before the Court involves a myriad of law. State choice of law, state secured transaction law, and state contract law entangle themselves around federal tax law, as it pertains to tax-deferred accounts and annuities. As far as the Court is aware, the exact question before it is a novel issue, as neither the Court nor coun-

---

1. There is some dispute as to whether Hamilton State Bank is appropriately before the Court in this case. During the pendency of this adversary proceeding, Douglas County Bank was closed by the FDIC, which later transferred all of Douglas County Bank's assets and any instruments and security agreements securing loans to Hamilton State Bank. On November 18, 2013, the Defendant filed a

*Motion to Amend Name to Reflect True Party in Interest. See* Def.'s Mot., Docket No. 42, November 18, 2013. For good cause shown and having seen no objections to the motion from Plaintiff, the Court granted the Motion, *see* Ct.'s Order, Docket No. 43, December 16, 2013, and, consequently, is satisfied that Hamilton State Bank is appropriately before the Court in this matter.

sel have found precedent that directly resolves the controversy. With this in mind, the Court disposes of the issue as follows.

## BACKGROUND.

Although certain facts in this case are disputed, those that are material to the outcome appear to be agreed upon. Moreover, often the documents in this case speak for themselves, despite a party's attempt to persuade the Court otherwise.

On October 17, 2001, the Debtor[2] purchased an Individual Retirement Annuity (hereinafter the "Annuity") from MetLife Investors USA Insurance Company, formerly Security First Life Insurance Company (hereinafter "MetLife"). The principal of the Annuity was significantly increased in July of 2004, when, upon cessation of his employment with a company called Abbott Laboratories, the Debtor caused certain assets, originally in an employee 401(k), to be rolled over into the Annuity.

The agreement between MetLife and the Debtor (hereinafter the "Annuity Contract") consists of generic annuity terms,[3] but as modified by nine (9) riders and one (1) endorsement. Accompanying the Annuity Contract was also an "IRA Disclosure Statement."[4] The Individual Retirement Annuity Endorsement (hereinafter the "Endorsement") provides:

THE FOLLOWING PROVISIONS APPLY TO A CONTRACT WHICH IS ISSUED ON A QUALIFIED BASIS IF THE APPLICATION INDICATES IT IS TO BE ISSUED UNDER THE INTERNAL REVENUE CODE OF 1986, AS AMENDED, ("CODE") SECTION 408. THE PROVISIONS OF THE APPLICABLE QUALIFIED RETIREMENT PLAN TAKE PRECEDENCE OVER THE PROVISION OF THIS CONTRACT. IN THE CASE OF A CONFLICT WITH ANY PROVISION IN THE CONTRACT OR ANY OTHER ENDORSEMENTS OR RIDERS, THE PROVISIONS OF THIS ENDORSEMENT WILL CONTROL. THE CONTRACT IS AMENDED AS FOLLOWS: ...

2. This Contract is not transferable.

3. This Contract, and the benefits under it, cannot be sold, assigned or pledged as collateral for a loan or as security for the performance of an obligation or for any other purpose to any person other than to the issuer of the Contract.

The IRS Disclosure Statement uses similar language, but appears to qualify it by including a section that explains the consequences when prohibited transactions, such as assignment or use as collateral, occur.

From November 14, 2008 to February 4, 2009, the Debtor entered into a series of loan transactions with Douglas County Bank, in the amounts of $35,200, $155,000, and $29,700. Each of these loan transactions consisted of a promissory note and a

---

2. Although the Debtor contends that the Annuity was purchased by Debtor's Individual Retirement Account (hereinafter "IRA"), the Annuity Contract specifically provides that "Craig Loren Albracht" is the "Owner" of the Annuity. This appears to also be evidenced by a Policy Service Request Form, dated November 16, 2009, which transferred the ownership of the Annuity from "Craig Loren Albracht" to "UBS Financial Services, Inc.," the custodian of Debtor's IRA.

3. The generic terms permit the assignment of rights and benefits under the Annuity Contract.

4. Although the Creditor believes that the IRA Disclosure Statement is part of the Annuity Contract, the Contract does not specifically incorporate it, as it does for the riders and endorsement. *See* Pl.'s Aff., Ex. 26, at 3C.

commercial security agreement, and each of those documents identified the assignment of Debtor's Annuity policy as collateral for the loan proceeds. Additionally, on November 7, 2008—prior to the loan transactions—the Debtor signed and executed an "Assignment of Life Insurance or Annuity Policy as Collateral" in favor of Douglas County Bank and identified the Annuity policy as the assigned collateral. MetLife never endorsed or approved of the assignment. Prior to receiving approval or disapproval, written or otherwise, of the assignment from MetLife, the Respondent funded the three loans.

Beginning on February 6, 2009, Plaintiff received three (3) letters from MetLife informing him that MetLife did not allow the collateral assignment of the Annuity. No correspondence was directed to the Creditor, either from the Debtor or MetLife, until after August 10, 2010 in response to the Creditor's demand that MetLife distribute the proceeds of the Annuity in satisfaction of Debtor's defaulted loan. At that time, the Creditor was informed that MetLife, in accordance with the terms of the Annuity Contract and the Internal Revenue Code (hereinafter "IRC"), had rejected the assignment and had not processed it.

On December 28, 2009, the Debtor filed for bankruptcy under Chapter 7 of the Code. The Debtor listed the Annuity as property of the estate on Schedule B and claimed it as exempt under the Official Code of Georgia Annotated (hereinafter "O.C.G.A.") § 44–13–100(a)(2)(F).[5] During the pendency of the case, Douglas County Bank sought and was granted relief from the automatic stay to pursue state remedies with regard to the Annuity. The Debtor received a discharge on November 29, 2010[6].

On December 29, 2010, the Creditor filed suit in the Superior Court of Fulton County, Georgia against the Debtor and MetLife, seeking to foreclose on its interests in the assigned Annuity. On August 15, 2012, after nearly two years of litigation in the Superior Court and before any resolution occurred, the Debtor again filed for relief under the Bankruptcy Code, seeking protection under Chapter 11. On September 10, 2012, the Debtor commenced the instant adversary proceeding, claiming that the Creditor never had a valid security interest in the collateral and that as a result of the Debtor's previous Chapter 7 case, the unsecured liability was discharged.

## RESPECTIVE LEGAL POSITIONS.

### I. Debtor's Legal Position.

The Debtor believes that the Creditor never established a valid security interest because the security interest never attached to the Annuity. Under Georgia's version of the Uniform Commercial Code (hereinafter the "UCC"), a "security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral. . . ." O.C.G.A. § 11–9–203(a). The Georgia UCC further pro-

---

**5.** Section 44–13–100(a)(2)(F) provides that any debtor who is a natural person may exempt for the purposes of bankruptcy "the debtor's right to receive . . . [a] payment from an individual retirement account within the meaning of Title 26 U.S.C. Section 408. . . ." O.C.G.A. § 44–13–100(a)(2)(F).

**6.** Creditor states that the discharge was subject to the relief from the automatic stay. The Court granted Creditor relief from the stay for the purpose of pursuing its interest, if any, in state court, where this Court believes that validity and extent of a secured lien under state law is more appropriately resolved. It is unfortunate that, after litigating for nearly two years, the issue would find its way back to this Court in the current proceedings.

vides that "a security interest becomes enforceable as against the debtor and third parties with respect to the collateral only if: (1) [v]alue has been given; (2) [t]he debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party; and (3) . . . [t]he debtor has authenticated a security agreement that provides a description of the collateral. . . ." O.C.G.A. § 11–9–203(b). The Debtor contends that because he never had the right to transfer, assign, or provide the Annuity as security, the Creditor is unable to satisfy the second element of the Georgia UCC. Primarily, the Debtor argues that the Creditor had knowledge of the anti-assignment provision,[7] that the language was clear, and that it forbade the Debtor from assigning his rights in the Annuity. Conjointly, the Debtor argues that the IRA, not the Debtor, owned the Annuity and that it was held in trust by the custodian/trustee, who alone had the power to pledge the annuity as collateral.[8]

## II. Creditor's Legal Position.

The Creditor argues that, as the "owner" of the Annuity, the Debtor had rights in the collateral, sufficient to satisfy the Georgia UCC. Additionally, the Creditor urges the Court to recognize that the anti-alienation provision was merely included in the Annuity Contract so that the contract "specifically complied" with the requirements for tax-deferred status under the IRC. Creditor further contends that a comprehensive look at the provision within the context of the IRC reveals that its violation only results in the Annuity's losing its tax-deferred character.

Section 408 of the IRC directs that an "Individual Retirement Annuity" meet the following requirements: "(1) the contract is nontransferable by the owner; . . . (4) the entire interest of the owner is nonforfeitable. 26 U.S.C. § 408(b). Additionally, an 'Individual Retirement Annuity' does not include such an annuity contract for any taxable year of the owner in which it is disqualified on the application of subsection (e) or for any subsequent taxable year." *Id.*

As discussed, subsection (e) establishes the circumstances whereby an IRA or an "Individual Retirement Annuity" loses its tax-deferred character. 26 U.S.C. § 408(e). Paragraph (2) of Subsection (e) provides that the entirety of an "Individual Retirement Annuity" loses the IRC protection, as of the first day of such taxable year, where "the individual for whose benefit any individual retirement account [or annuity] is established, that individual or his beneficiary engages in any transaction prohibited by section 4975 with respect to

---

7.   There does not appear to be a dispute about the fact that the Creditor had knowledge of the anti-assignment provision.

8.   Alternatively, the Debtor believes that it can invoke, as Debtor–in–Possession, the trustee lien avoidance provisions of Sections 544(b) and 545(2).
Section 544(b)(1) permits a debtor-in-possession to void a transfer of an interes in a debtor's property where that interest "is voidable under applicable law by a creditor holding an unsecured claim. . . ." *See* 11 U.S.C. § 544(b)(1); 11 U.S.C. § 1107(a). As a prerequisite, the application of this power would require that the Creditor not have a valid

security interest. Therefore, analysis under this provision effectively serves no purpose. Either the Annuity was successfully pledged and Section 544(b)(1) is inapplicable, or the Annuity was not successfully pledged and Section 544(b)(1) is unnecessary.
Section 545(2) provides that a debtor in possession may avoid a "statutory lien" to the "extent that such lien . . . is not perfected or enforceable at the time of commencement of the case. . . ." *See* 11 U.S.C. § 545(2); 11 U.S.C. § 1107(a). The lien in question, however, is not a statutory lien, but rather an alleged voluntary lien, causing Section 545(2) to be inapplicable.

such account...." 26 U.S.C. § 408(e)(2). Section 4975 of the IRC prohibits a "disqualified person" from any "act ... whereby he deals with the income or assets of a plan in his own interest or for his own account...." 26 U.S.C. § 4975(c)(1)(E). A "disqualified person" is defined as, among other things, a "fiduciary." 26 U.S.C. § 4975(e)(2)(A). A "fiduciary" is further defined as, among other things, a person who "exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of assets ... or ... has any discretionary authority or discretionary responsibility in the administration of such plan." 26 U.S.C. § 4975(e)(3)(A-C); *see also In re Hipple*, 225 B.R. 808, 812 (Bankr.N.D.Ga.1996) (Cotton, B.J.). There is no disagreement that the Debtor exercises some discretion over the investment strategy of the Annuity. Moreover, the Debtor has the right to withdraw the proceeds of the Annuity at anytime, albeit with taxes and penalties assessed. Therefore, he is a fiduciary under the terms of the IRC, and if the Court finds that he committed a prohibited transaction, then the Annuity would have lost the IRC protection as of the first day of the taxable year in which such prohibited transaction occurred, as well as for any subsequent year. *See In re Hipple*, 225 B.R. at 812.

Additionally, the IRC stipulates that "if, during any taxable year the owner of an individual retirement annuity borrows any money under or by use of such contract, the contract ceases to be an individual retirement annuity as of the first day of such taxable year ... [,] [and] [i]f during any taxable year of the individual for whose benefit an individual retirement account is established, that individual uses the account or any portion thereof as security for a loan, the portion so used is treated as distributed to that individual." 26 U.S.C. § 408(e)(3-4).

In support of its position that the terms of the Annuity Contract included the anti-alienation provisions for the sole purpose of specifically complying with the terms of the IRC, the Creditor directs the Court to the case of *In re Roberts*, 326 B.R. 424 (Bankr.S.D.Ohio 2004). In that case, the bankruptcy trustee and a creditor objected to the debtors' claims of exemption in their IRAs where the debtors had pledged portions of those IRAs as collateral for loans. *In re Roberts*, 326 B.R. 424, 425–426 (Bankr.S.D.Ohio 2004). Examining the language of the IRC, the *Roberts* Court held that "a pledge of funds in an IRA constitutes a distribution of the funds to the individual ... [,] [and that] [t]he consequence under the Tax Code [and Bankruptcy Code] is that a taxable event has occurred ... [and] the funds are no longer considered to be IRA funds...." *Id.* at 426. Additionally, the *Roberts* Court rejected the debtors' contention that they did not own their respective IRAs, as they listed the IRAs on their schedules and sought an exemption as to their equity. *Id.* at 427.

The Creditor also refers the Court to the Fifth Circuit's case of *Lewis v. Bank of America, N.A.*, 343 F.3d 540 (5th Cir. 2003). In *Lewis*, the borrower was advised that the bank would only execute a proposed loan on a "cash-secured basis." *Lewis v. Bank of America, N.A.*, 343 F.3d 540, 543 (5th Cir.2003). On assurances from the bank that his funds would be put into tax-deferred CDs, the borrower liquidated his pension holdings and placed them in CDs with the bank. *Id.* The bank failed to place the funds into tax-deferred CDs, and the borrower brought suit for

breach of contract.[9] The jury entered a verdict in favor of the borrower. *Id.* at 544–545. On appeal, the Fifth Circuit overturned the jury's verdict, finding that the borrower failed to present evidence that he suffered damages as a result of the breach of contract. *Id.* at 545. The *Lewis* Court found that because the effect of pledging an IRA results in the portion so pledged losing its tax-deferred status, the bank's fulfillment of the contract by placing the funds in IRC compliant CDs, but used as collateral for the intended loan, would have created precisely the same mandatory tax consequences as the bank's alleged breach in not placing the funds in the protected CDs. *Id.* "Pledging the IRA funds as security . . . had the same tax effect as withdrawing the same funds from an IRA and investing them in non-IRA CDs." *Id.*

The Creditor concludes that the Annuity Contract's inclusion of the anti-alienation provisions was required by the Tax Code, not as a means of preventing the Debtor from pledging his Annuity, but as a means of making known the consequences of such an action. The Creditor further contends that upon violation of the anti-alienation provision, the Annuity ceased to exist as a tax-deferred annuity and became a simple annuity without the protections created by the IRC or Georgia exemption law, thereby assignable, subject to the security interests of the Creditor.

## CONCLUSIONS OF LAW.

### I. Summary Judgment Standard.

In accordance with Federal Rule of Civil Procedure 56 (applicable to bankruptcy under Fed. R. Bankr.P. 7056), this Court will grant summary judgment only if "there is no genuine issue as to any material fact and . . . the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(a); *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir.2012) (holding that a ruling in favor of a particular party is appropriate where the undisputed material facts show that the party is entitled to judgment as a matter of law). A fact is material if it might affect the outcome of a proceeding under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A dispute of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The moving party has the burden of establishing the right of summary judgment, *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991); *Clark v. Union Mut. Life Ins. Co.*, 692 F.2d 1370, 1372 (11th Cir. 1982), and the Court will read the opposing party's pleadings liberally. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505.

In determining whether a genuine issue of material fact exists, the Court must view the evidence in the light most favorable to the nonmoving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *Rosen v. Biscayne Yacht & Country Club, Inc.*, 766 F.2d 482, 484 (11th Cir.1985). In reviewing cross-motions, the Court accepts the facts as stated in the pleadings and views them in the "light most favorable to the non-moving party on each motion." *Chavez v. Mercantil Commercebank, N.A.*, 701 F.3d 896, 899 (11th Cir.2012). The moving party must identify those evidentiary materials listed in Rule 56(c) that establish the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477

---

**9.** The borrower also brought a fraudulent inducement claim, which was resolved in a similar manner.

U.S. 317, 323–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also* FED.R.CIV.P. 56(e). Once the moving party makes a *prima facie* showing that it is entitled to judgment as a matter of law, the nonmoving party must go beyond the pleadings and demonstrate that there is a material issue of fact which precludes summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Martin v. Commercial Union Ins. Co.,* 935 F.2d 235, 238 (11th Cir.1991).

## II. Discussion.

If the Debtor "accomplished" prohibited transactions, as it appears the Debtor intended, the Court agrees with the Creditor's analysis that the result would be the loss of IRC protections. *See In re Hipple,* 225 B.R. 808, 812 (Bankr.N.D.Ga.1996) (Cotton, B.J.). Likewise, if the Debtor's right to assign was not inhibited, the assignment would be valid, and the loan transactions unhindered under the Georgia UCC. However, the Court is not convinced that the Debtor accomplished the intended transactions, and even if the Debtor's conduct caused the Annuity to lose the protection provided under federal and state tax and exemption law, such a result may have implications on the administration of the bankruptcy estate, but it fails to answer the question before the Court as to whether the Creditor holds a valid security interest in the Annuity.

■ Moreover, the cases to which the Creditor directed the Court's attention differ from the instant case in one key respect. In none of those cases did the IRA or annuity contract contain an anti-assignment provision.[10] Although, the Creditor contends that the anti-assignment language in the Debtor's Annuity Contract

was included to "specifically comply" with the IRC, the Court cannot agree. To comply with the IRC, the Annuity Contract needed only to mirror the IRA Disclosure Statement and/or Sections 408 and 4975 of the IRC, with the relevant language indicating the consequences of a breach. However, the Annuity Contract spoke in absolutes. Nothing precluded the parties from agreeing to terms that are more restrictive than the necessary minimum for compliance with Section 408 of the IRC. *See cf. In re Shallow,* 393 B.R. 277, 287 (Bankr.D.Conn.2008) ("As a general matter ... federal law sets the outer boundaries...."). The Court cannot say that the inclusion of the terms, as absolute and without qualification, was intended for mere compliance with Section 408 of the IRC. Therefore, at issue here is whether the Debtor validly assigned his interest in the Annuity to the Creditor. Accordingly, the Court must resort to state law. *Butner v. U.S.,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979).

■ As mentioned previously, a prerequisite for attachment requires that "[t]he debtor has rights in the collateral or the power to transfer rights in the collateral to a secured party...." O.C.G.A. § 11–9–203(b). As an initial matter, the Court rejects the Debtor's contention that the IRA, and not the Debtor, was the owner of the Annuity at the time of the alleged transactions, and as such, the Debtor had no right to assign the collateral as security for a loan. The Annuity Contract, entered into in October of 2001, identifies "Craig Loren Albracht" as the "Owner" of the Annuity. This status was not changed until a Policy Service Request Form, dated November 16, 2009, transferred ownership

---

**10.** A subtle, but important, distinction is that the collateral for the series of loan transactions was the "assignment" of the Annuity, not the Annuity itself. It stands to reason that if the Debtor was incapable of assigning the Annuity, he could not pledge an assignment of it as collateral for the loans.

of the Annuity from "Craig Loren Albracht" to "UBS Financial Services, Inc.," the custodian of Debtor's IRA. This transfer of ownership was completed after the Debtor's pledges of the assigned Annuity. Therefore, the Court cannot accept the Debtor's contention that he had no rights to assign because he was not the owner of the annuity.

■ However, being the owner of the annuity does not automatically bestow upon the Debtor rights in the Annuity, sufficient for him to assign it. Because the Annuity Contract incorporates anti-assignment provisions, the Court must determine the significance of their inclusion.[11]

■ As a general proposition, contract rights and duties are assignable. *See In re Terry,* 245 B.R. 422, 426 (Bankr. N.D.Ga.2000) (Drake, B.J.) (citing *Dennard v. Freeport Minerals Co.,* 250 Ga. 330, 297 S.E.2d 222, 226 (1982) (citing RESTATEMENT (SECOND) OF CONTRACTS § 317 (1979))). In fact, the "modern trend with respect to contractual prohibition on assignments is to interpret these clauses narrowly...." *In re Terry,* 245 B.R. at 427 (quoting *Wonsey v. Life Ins. Co. of N. Am.,* 32 F.Supp.2d 939, 943 (E.D.Mich. 1998)). Where a contract term prohibits the assignment of rights under a contract, unless the parties manifest a different intention, violation of the term traditionally gives the nonbreaching party a "right to damages for breach ... but does not render the assignment ineffective." *Settlement Funding, LLC v. Jamestown Life*

*Ins. Co.,* 78 F.Supp.2d 1349, 1360 n. 15 (N.D.Ga.1999); *see also Bel–Ray Co., Inc. v. Chemrite (Pty) Ltd.,* 181 F.3d 435, 440–442 (3rd Cir.1999) ("To reveal the intent necessary to preclude the power to assign, or cause an assignment violative of contractual provision to be wholly void, ... the assignment provision must generally state that nonconforming assignments (i) shall be 'void' or 'invalid,' or (ii) that the assignee shall acquire no rights or the nonassigning party shall not recognize any such assignment. In the absence of such language, the provision limiting or prohibiting assignments will be interpreted merely as a covenant not to assign ... liable in damages.").

■ Notwithstanding the general rule, the Georgia Supreme Court opined long ago that "[c]ertain classes of contracts are inherently nonassignable in their character, such as promises to marry, or engagements for personal services, requiring skill, science, or peculiar qualifications." *Cowart v. Singletary,* 140 Ga. 435, 79 S.E. 196, 201 (1913). That certain contractual rights and duties, such as those typically found in personal services contracts, cannot be assigned without the consent of the other party is a well established rule of law. *See Gold Kist, Inc. v. Wilson,* 227 Ga.App. 848, 490 S.E.2d 466, 470 (1997); *Decatur N. Assoc., Ltd. v. Builders Glass, Inc.,* 180 Ga.App. 862, 350 S.E.2d 795, 797–798 (1986). The Annuity Contract does not fall into the category of a personal services contract[12] because neither con-

---

**11.** Because the document establishing the Annuity is a contract, it is governed by "standard contract principles." *See In re Terry,* 245 B.R. 422, 425 n. 8 (Bankr.N.D.Ga.2000) (Drake, B.J.). Although the parties did not initially raise choice of law issues, the Court, finding it important for obvious reasons that it apply the correct law in interpreting the agreement, requested that the parties supplement the record. In response, the parties stipulated to Georgia contract law being the correct law governing the Annuity Contract under Georgia's *lex loci contractus* choice of law rule. *See* Ct.'s Order, October 28, 2013, ECF No. 39; *see also* Joint Stipulation, November 5, 2013, ECF No. 41.

**12.** The Court has previously approved of the Ohio Court of Appeals definition of a "personal services contract." A personal services

tracting party specifically relies on the specialized skills or abilities of the other party.

■ Since the articulation of the general rule and its primary caveat, other exceptions have arisen where anti-assignment provisions are present. One such exception emerges in the context of executory contracts. An executory contract is defined by the Georgia Code as "one in which something remains to be done by one or more parties." O.C.G.A. § 13–1–2. Where mutual obligations remain to be executed, "the parties to an executory contract may in terms prohibit its assignment, so that an assignee does not succeed to any rights in the contract by virtue of the assignment." *Mingledorff's Inc. v. Hicks,* 133 Ga.App. 27, 27, 209 S.E.2d 661 (1974). However, "once a party to the contract performs its obligations thereunder so that the contract is no longer executory, its right to enforce the other party's liability under the contract may be assigned without the other party's consent[,] even if the contract contains a non-assignment clause." *Mail Concepts, Inc. v. Foote & Davies, Inc.,* 200 Ga.App. 778, 781, 409 S.E.2d 567 (1991).

With respect to the Debtor's contractual obligations, the Annuity Contract is not executory. As of the date of the loan transactions, the Debtor had fully performed the duties required of him. The contract was established by an investment of principal, and although the Annuity's principal could be supplemented, no more was affirmatively required of the Debtor

under the Annuity Contract. As the Court generally understands *Mail Concepts, Inc.,* once the Debtor held up his end of the Annuity Contract, he had every right to assign his interest in the Annuity, not withstanding the anti-assignment clause.

To the best of its knowledge, this Court has addressed an issue similar to the current one on only a single occasion. *See In re Terry,* 245 B.R. 422 (Bankr.N.D.Ga. 2000) (Drake, B.J.). In *Terry,* the debtor received annuity payments from a settlement agreement. *Id.* at 424. The debtor and a creditor executed a purchase agreement whereby the debtor transferred his right to half of the owed payments to the creditor. *Id.* However, the settlement agreement forbade the debtor from transferring his rights to the annuity. *Id.* After filing for bankruptcy, the debtor contended that the annuity payments were property of the estate, as he was prohibited from transferring them to another party. *Id.* at 425. The Court found the debtor's "attempt to reverse" the sales transaction not only "disingenuous,"[13] but, primarily relying on the general rule and *Mail Concepts, Inc.,* "not supported by applicable law." *Id.* at 426.

Be that as it may, the Georgia Supreme Court distinguished *Mail Concepts, Inc.,* and ultimately the decision rendered by this Court in *Terry,* in its opinion of *Singer Asset Fin. Co. v. CGU Life Ins. Co.,* 275 Ga. 328, 567 S.E.2d 9 (2002). Although *Singer Asset Fin. Co.* is not directly on point with this case,[14] the Court finds it

---

contract is "one in which the offeree is vested with discretion in accomplishing the assigned tasks because his skills, knowledge, experience and expertise are unique to the area and could not be duplicated by others not similarly qualified." *In re Terry,* 245 B.R. 422, 426 n. 10 (Bankr.N.D.Ga.2000) (Drake, B.J.) (quoting *Yellow Cab of Cleveland, Inc. v.*

*Greater Cleveland Reg'l Transit Auth.,* 72, Ohio App.3d 558, 595 N.E.2d 508, 511 (1991)).

**13.** The Court does not disagree that the Debtor's attempt in this case to "reverse" his transfer is just as disingenuous as the debtor's attempt in *Terry.*

**14.** As the Court has stated, none of the cases that it could find, including *Terry,* are on

most analogous to the question before it, and as it was decided by the Georgia Supreme Court, its holding is highly persuasive.

In *Singer Asset Fin. Co.* the Court addressed a matter of first impression, "whether a tax-preferred structured settlement agreement can preclude the assignment of future [annuity] payments." *Singer Asset Fin. Co. v. CGU Life Ins. Co.*, 275 Ga. 328, 328, 567 S.E.2d 9 (2002). Pursuant to a structured settlement agreement, CGU Life Insurance Company agreed to make future periodic payments to a Christopher and Jonathan Revill. The structured settlement contained an anti-alienation clause stating that "future payments could not be 'accelerated, deferred, increased or decreased ... nor shall the [Revills] have the power to sell or mortgage or encumber same, or any part thereof, by assignment or otherwise.'" *Id.* Subsequently, CGU Life Insurance Company made a permitted qualified assignment of its obligation to make payments to CGU Annuity Services Corporation. To fund the structured settlement, CGU purchased an annuity on behalf of the Revills. *Id.* Thereafter, the Revills assigned their right to receive some of their future payments to Singer Asset Finance Company in return for a lump sum payment. *Id.* at 329, 567 S.E.2d 9. Upon discovering the assignment, CGU brought suit for declaratory judgment, seeking to have the assignment declared unenforceable; Singer and the Revills counterclaimed, seeking a declaration that the assignment was valid. *Id.*

The court rejected Singer's reliance on *Mail Concepts, Inc.* by distinguishing the case before it. Although recognizing the general principle that contracts are assign-

able, the Georgia Supreme Court held that a contract containing a non-assignment clause, or the rights thereunder, "should not be assigned when that clause was inserted to protect a party from a material reduction in the value of the contract." *Id.* Having considered the record and any inherent implications, the court found that the non-assignment clause was inserted to protect CGU from just such a material reduction in value. *Id.* at 330, 567 S.E.2d 9. By making a qualified assignment, CGU maintained a tax-neutral transaction for as long as the periodic payments to the payees were not "accelerated, deferred, increased, or decreased." *Id.* The Revills' assignment to Singer jeopardized this position. *Id.* Moreover, the court said that the assignment did not necessarily have to bring about the adverse consequences, but that just the "loss of predictability stemming from the fact that CGU *might* suffer adverse tax consequences is a material increase in the burden on CGU and sufficient reason to preclude the assignment." *Id.* (citing *Liberty Life Assurance Co. v. Stone Street Capital*, 93 F.Supp.2d 630, 636 (D.Md.2000)) (emphasis in original). The Georgia Supreme Court also found that the assignment could increase the burden on CGU in other respects, such as disrupting CGU's ability to "'predict the ... accounting implications, administrative costs, and risk of exposure to competing claims to future settlement payments.'" *Id.* (quoting *Liberty Life Assurance Co. v. Stone Street Capital*, 93 F.Supp.2d 630, 634 (D.Md.2000)). Therefore, the Georgia Supreme Court concluded that where the assignment "exposes the obligor to *potential* litigation and administrative risks[,]" the anti-assignment provision should be enforced. *Id.* (emphasis added).

point with the facts before it. *Singer Asset Fin. Co.*, however, has nearly the same fact pattern as *Terry;* and, therefore, the Court

finds its pivot from *Mail Concepts, Inc.* significant.

■ Although the Annuity in the case before the Court was not created to satisfy a structured settlement—nor is this case concerned only with annuity payments—the Court sees no reason why the principles pertaining to the enforcement of anti-assignment provisions should not be ascribed to the current facts. The rule derived from *Singer Asset Fin. Co.* is that rights and benefits under a contract should not be assigned where an anti-assignment provision was included for the purpose of protecting a party from a material reduction in the value of the contract. *Singer Asset Fin. Co. v. CGU Life Ins. Co.,* 275 Ga. 328, 329, 567 S.E.2d 9 (2002). Here, there appear to be a number of reasons for MetLife's inclusion of the provision in the Annuity Contract between itself and the Debtor.

■ Most notably, the Court recognizes that certain charges are assessed on the "average daily net asset value of" the Annuity.[15] As the Court has reviewed, *supra,* there are a number of ways in which a tax-deferred annuity not only can have its protection stripped, but also can have the basis taxed and penalized.[16] A reduction in the value of the basis results in a reduction in the income that MetLife receives from the Annuity. As the Georgia Supreme Court pointed out, the value to be protected by the provision's inclusion need only be potentially threatened to create a "sufficient reason to preclude the assignment." *Id.* at 330, 567 S.E.2d 9.

■ Likewise, the Court believes that a number of the concerns identified by *Singer Asset Fin. Co.* may inherently arise as a result of the assignment of this contract. The possibility of assignment creates a strong chance that MetLife's burden in accurately accessing the accounting implications and administrative costs will rise. Moreover, by permitting assignment, MetLife would potentially risk exposure to competing claims to the proceeds of the Annuity. If, as the Creditor contends, the assignment could be valid based on the unilateral actions of the Debtor, MetLife could find itself in the perilous position of distributing the Annuity's proceeds only to find a petitioner with a superior claim come forward. Alternatively, MetLife may discover that multiple claimants may simultaneously seek the proceeds of the Annuity, thereby forcing MetLife to litigate an interpleader action.

To reiterate, an anti-assignment clause should be enforced where it is included as a means of protecting a party against the material reduction in the value of the contract. As observed, the danger from nonenforcement need only potentially expose a party to a material reduction in the value. Because the Court believes that MetLife's inclusion of the anti-assignment provision serves such a purpose, the provision ought to be enforced.

The Court recognizes that in the current case, unlike those pertaining to settlement agreements, the Debtor was fully capable of withdrawing funds from the IRA at any time, and in his own discretion, and then using the funds in whatever manner he deemed fit. However, the

---

**15.** According to the Annuity Contract, the Debtor's Annuity would be charged annually at 1.3% for Mortality and Expense Charges; .25% for Administration Charges; .10% for Death Benefit Rider Charges; and .25% for Additional Death Benefit Rider Charges. *See* Pl.'s Aff., Ex. 26, at 3A.

**16.** According to the IRS Disclosure Statement, if a party were to engage in a prohibited transaction under the IRC, the Debtor would be required to include its value in his income for the year, and the Debtor would potentially be subject to a 10% tax on premature distributions and a 15% tax on excess distributions.

Court does not believe this makes the anti-assignment provision significantly less valuable to MetLife. A withdrawal of the funds, as opposed to the assignment of the funds, grants MetLife a degree of certainty as to the accounting implications and other administrative costs involved. Additionally, if the Debtor is only capable of utilizing the funds by withdrawing them, MetLife has eliminated the risk to itself of competing claims to the funds. Moreover, MetLife's interest in the principal of the Annuity is protected from the Debtor's inadvertently subjecting the Annuity to taxes and penalties. Undoubtedly, the Debtor, in order to withdraw the funds, would be required to contact MetLife. As compared to the Debtor's unilaterally entering into an assignment contract with a third party, MetLife is provided an opportunity to dissuade the Debtor from his intention by explaining the consequences of an early withdrawal of tax-deferred funds. Although the Debtor ultimately has the decision on whether to withdraw funds and consequently take the penalties involved, MetLife's inclusion of the anti-assignment clause protects its interest in having the largest possible portion of those funds remain in an account with the company.

In passing, the Court observes that the Debtor may receive a windfall by retaining the Annuity after having received and spent the loan proceeds. However, "courts, even in equity must respect lawful contracts made by competent persons, and sympathy is not a ground for equitable relief." *Settlement Funding, LLC v. Jamestown Life Ins. Co.,* 78

F.Supp.2d 1349, 1356 (N.D.Ga.1999) (quoting *McClellan v. Ashley,* 200 Va. 38, 42, 104 S.E.2d 55 (1958)). Therefore, the agreement bargained for between MetLife and the Debtor should be enforced. Unfortunately, having secured the Debtor's loan with an assignment of the Annuity, the Creditor simply took a risk that did not pay off. *See, e.g., First Bank of Linden v. Sloma,* 43 F.3d 637, 641 (11th Cir. 1995) (Hatchett, C.J.) (dissenting).

### CONCLUSION.

Having given this matter its careful consideration, the Court concludes that the Debtor did not have the authority to assign his interest in the Annuity to the Creditor. Consequently, the Creditor's security interest failed to attach and the Creditor does not and did not have a valid security interest in the Annuity.

Accordingly, it is hereby

**ORDERED** that Debtor's Motion for Summary Judgment is **GRANTED** and Respondent's Cross–Motion for Summary Judgment is **DENIED.**

The Clerk is **DIRECTED** to serve a copy of this ORDER on the Debtor, the Respondent, respective counsel, and the U.S. Trustee.